UNITED STATES of America,
Plaintiff–Appellee,

v.

Lavoyce R. BILLINGSLEY,
Defendant–Appellant.

No. 96–1782.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1996.

Decided May 30, 1997.

Barry Rand Elden, Chief of Appeals, Gregory T. Mitchell (argued), Office of the

United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff-Appellee.

Paul A. Wagner (argued), Chicago, IL, for Defendant-Appellant.

Before COFFEY, MANION and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

Lavoyce Billingsley (Billingsley) was convicted by a jury on one count of interstate transportation of a stolen motor vehicle. See 18 U.S.C. § 2312. He was sentenced to 41 months' incarceration. We affirm.

## I. Background

In early October 1994, Billingsley made plans at his home in South Holland, Illinois to visit his girlfriend at Iowa State University, in Ames, Iowa. Billingsley invited his friend, DeJuan Ward (Ward), who had travelled to Ames with Billingsley on a prior occasion, to accompany him. Neither Billingsley nor Ward owned a car, but Billingsley told Ward that his cousin would rent a car for them to use during the trip.

On October 14, Billingsley told Ward that his cousin had decided not to rent the car for them, and the trip to Iowa was canceled. Instead, Ward visited Billingsley at his home in South Holland on Friday the 14th. That evening, the two left Billingsley's house and took a walk around the neighborhood and to a local park. They were joined by another friend, Shawn Brown (Brown), and walked down a residential street in South Holland. At approximately 9:00 p.m., as the three were walking down the residential street, a red 1993 Pontiac Bonneville pulled immediately in front of them and drove into a driveway. The three were forced to stop momentarily, and they then proceeded about three houses past the driveway. As they were walking past the driveway, Billingsley remarked to Ward and Brown that the car was "nice," and further stated that he "wanted a car like that." After Billingsley made these statements, the three returned to the driveway the car had entered, and observed that the vehicle was now parked in a garage

detached from the house and about twenty-five feet from the rear door of the house. When they returned to the driveway, Billingsley and Brown stationed themselves off to the side of the garage in the dark, and Billingsley instructed Ward to knock on the rear door of the house and attempt to get the owner to come outside. Ward reported that Billingsley repeatedly told him: "It will be easy. Just knock on the door." After Ward refused a number of times to knock on the door, and finally told the other two to "come on," making clear that he wanted to leave, the three left the area.

The next night, Billingsley and Brown returned without Ward to the house where they had seen the red Pontiac. The two waited in the dark near the garage. At approximately 9:00 p.m., the Bonneville reentered the driveway and the owner parked in the garage. Arthur Patten (Patten), the owner of the car and an 82-year old man, exited his car and began walking toward the rear door of his house twenty-five feet away. As Patten was about to enter his back door and began to step up onto the back stoop, the defendant and Brown rushed from the darkness of the garage and intercepted him. Billingsley displayed a small handgun [1] and removed Patten's wallet as well as his car keys. Billingsley opened the back door of Patten's house and ordered him to go inside, and instructed the elderly man to turn off the house alarm. Billingsley then ordered the elderly gentleman Patten to open the garage door from an electronic opener located inside the house near the back door as he pushed Patten out the back door toward the garage. The defendant also directed Patten to produce the title to the car, but the elderly man replied that he did not know where the title was. At that point, Billingsley again pointed the handgun at Patten, and again demanded the title. In response, Patten suggested that the title might be in the glove compartment of the Bonneville. At this time Billingsley and Brown both entered the car and searched for the title. While they were searching, Patten escaped to his neighbor's

---

**1.** As discussed *infra,* Billingsley's possession of this gun and the accompanying ammunition form the basis for an upward departure in his sentence.

house, and heard the car being driven away. Patten's neighbor called the police.

The following day (October 16), Billingsley called the home of another of his friends, Gerald Simms (Simms), and Ward was present in the house. Billingsley spoke with Ward over the phone and asked if he was still interested in going to Iowa. Ward responded that he was, and Billingsley made arrangements to pick him up. Billingsley arrived at Simms' house, where, after visiting briefly with Simms, the defendant and Ward left to walk to the car. Upon arriving at the parked car, Ward observed what he believed to be the vehicle he and Billingsley had noticed on the evening of October 14. Ward remarked to Billingsley, "[y]ou got it," by which he meant Billingsley "got" the red Pontiac they had seen on October 14. Billingsley nodded response in the affirmative with a head gesture. Ward and Billingsley entered the vehicle, picked up their clothes, and thereafter left for Ames. Billingsley drove during the six-hour trip and told Ward that he planned to leave the Pontiac in Ames with a friend and borrow a different car for the return trip.

At approximately 12:30 a.m., when the defendant and Ward arrived in Ames, a local police officer, Kevin Holmes, observed Billingsley speeding, and followed the Bonneville as it pulled up to a gas pump outside of a convenience store. Officer Holmes walked up to the defendant, who was in the process of pumping gas, and requested a driver's license and registration. Billingsley produced a receipt from a ticket he received in Illinois, as well as the vehicle's title. Officer Holmes noticed that the name on the receipt from the ticket did not correspond with the owner's name on the title, and asked Billingsley who owned the vehicle. The defendant responded that his grandfather had allowed him to use the car. As the officer continued to question Billingsley, additional officers, who had received reports that the vehicle Officer Holmes had pulled over was reported stolen, arrived at the scene. The officers exited their squad car with their weapons drawn, and ordered Billingsley and Ward to the ground. At this time the suspects fled

on foot. Billingsley was apprehended almost immediately, handcuffed, subjected to a pat-down search, and placed in Officer Holmes' squad car. Ward was caught a few minutes thereafter and ordered into a different police vehicle.

Upon returning to his squad car, Officer Holmes observed that Billingsley was handcuffed with his hands in front of him, though Ames police officers generally handcuff suspects with their hands behind their backs. Officer Holmes further observed that there were perspiration marks on the seat, which led him to believe that the defendant had slid from one side of the seat to the other. Billingsley was removed from this squad car, and transferred to another police vehicle. Officer Holmes then performed a search of the seating area of his car, which revealed the presence of a small loaded handgun, and a separate magazine containing three bullets, hidden under the cushions of the front passenger seat. Officer Holmes testified that, prior to commencing his shift that night, he performed a thorough search of his squad car, and there were no weapons in the vehicle at that time. He also testified that no one else had entered the car other than Billingsley.

Billingsley was questioned as to how he obtained possession of the reported stolen red Pontiac. He changed his initial story that he had obtained it from a grandparent, and now stated that he had traded a car he owned earlier in the day in Chicago with a person named "Carlos." He was unable to identify Carlos nor was he able to provide either a last name or address for Carlos. When questioned about his possession of a gun and bullets at the time of his arrest, Billingsley denied either owning or possessing a gun or bullets. When he was confronted with the weapon found in the back of Officer Holmes' squad car, the defendant laughed at the officers and said "[p]rove it."

Billingsley was brought before a grand jury and charged with transporting a motor vehicle across state lines knowing it to be stolen, in violation of 18 U.S.C. § 2312.[2]

2. The record does not reflect that Billingsley was charged with illegal possession of the gun or

Ward, also in custody, agreed to testify against the defendant. After a three-day jury trial, Billingsley was found guilty of transporting the stolen Pontiac across state lines. At the initial sentencing hearing, the government argued that, since Billingsley had obtained the Pontiac from Mr. Patten through the use of force, the defendant should be sentenced pursuant to the Sentencing Guideline applicable to robbery, *see* U.S.S.G. § 2B3.1, which yields a base offense level of twenty. Billingsley argued that, since the crime of interstate transportation of a stolen car does not require proof of the use of force to obtain the car, he should be sentenced according to the guideline provision applicable to transporting stolen property, *see* U.S.S.G. § 2B1.1. This provision yields a base offense level of four. The district judge ordered briefing on the issue of the applicable guideline and offense level, and scheduled a second sentencing hearing.

At the second sentencing hearing, the district judge agreed with the defendant Billingsley's argument that he should be sentenced under § 2B1.1 instead of § 2B3.1, and proceeded to add a number of enhancements to Billingsley's sentence. He enhanced Billingsley's offense level two pointsnafter finding that, based on Mr. Patten's advanced age, he was a "vulnerable victim" within the meaning of § 3A1.1. Next, he enhanced the defendant's offense level two points for being an "organizer or leader" of the criminal activity under § 3B1.1(c).[3] Finally, the judge departed upward five levels pursuant to § 5K2.6, which provides grounds for an upward departure where a "weapon or dangerous instrumentality was used or possessed in the commission of the offense." The net result was that Billingsley's offense level was increased and calculated at twenty. The judge sentenced Billingsley to 41 months' imprisonment. On appeal, Billingsley challenges the two enhancements, as well as the upward departure.

ammunition.

**3.** The judge also imposed two enhancements not challenged by Billingsley on appeal. Pursuant to § 2B1.1(b)(1), which provides for enhancements in the defendant's offense level based on the value of the property stolen, the judge enhanced

## II. Issues

A. Whether the trial court erred in finding that Mr. Patten was a "vulnerable victim"

B. Whether the district judge erred in finding that Billingsley was an "organizer or leader" of criminal activity

C. Whether the judge erred in departing upward five levels based upon Billingsley's possession of the handgun and ammunition found in the Ames police car.

## III. Discussion

### A. The "vulnerable victim" enhancement

 Billingsley challenges the two-level adjustment he received under the "vulnerable victim" provision of § 3A1.1 of the guidelines. The guideline provides, in relevant part, that the defendant's offense level is to be increased two levels where "the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1. We recently reviewed the standards by which we determine when this enhancement is proper in *United States v. Jackson,* 95 F.3d 500 (7th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 404, 136 L.Ed.2d 318 (1996):

We review a district court's factual finding that a defendant preyed on vulnerable victims only for clear error. *United States v. Sutherland,* 955 F.2d 25, 26 (7th Cir. 1992). We have previously noted that " 'vulnerability' is the sort of fact which the trial court is peculiarly well-positioned to gauge...." *United States v. White,* 903 F.2d 457, 463 (7th Cir.1990) (quoting *United States v. Mejia–Orosco,* 868 F.2d 807, 809 (5th Cir.1989)). In order to apply the § 3A1.1(b) enhancement, the district court must find both 1) that a victim of the

Billingsley's offense level by five. He also enhanced Billingsley's criminal offense level two points based upon the judge's finding that the offense involved "more than minimal planning." *See* U.S.S.G. § 2B1.1(b)(5)(A) (1994); § 2B1.1(b)(4)(A) (1995).

defendant's crime was unusually vulnerable in some way, and 2) that the defendant targeted that victim because of this vulnerability. *Id.; United States v. Singh,* 54 F.3d 1182, 1191 (4th Cir.1995). A person can be "unusually vulnerable" due to a characteristic like age or physical or mental handicap, or due to some other characteristic that makes that person "particularly susceptible" to the defendant's crime. U.S.S.G. § 3A1.1(b).

95 F.3d at 507.

Billingsley makes two arguments with respect to this enhancement. Initially he claims that Mr. Patten, despite his advanced age, should not be considered as a "vulnerable victim" to Billingsley's attack, because he was not "unusually vulnerable." The defendant acknowledges our decision in *United States v. White,* 903 F.2d 457 (7th Cir.1990), in which we stated that "[i]t is obvious that people of advanced years in general are less capable of resisting attack than are younger people." 903 F.2d at 463. Billingsley asserts, however, that because Mr. Patten testified that he "ran" to his neighbor's house, he must be the "counterpoint" to our statement in *White.* The defendant fails, however, to note our observation in *White* that "vulnerability is the sort of fact which the trial court is *peculiarly well-positioned to gauge, particularly in instances when the trial court has had an opportunity to observe the victim in court."* Id. (quoting *United States v. Mejia–Orosco,* 868 F.2d 807, 809 (5th Cir. 1989) (emphasis added)). As we stated in *United States v. Tolson,* 988 F.2d 1494 (7th Cir.1993):

> [T]he [sentencing] judge has the best "opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements," as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record.*

988 F.2d at 1497 (quoting *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992) (emphasis in original)).

■ The trial judge here had an ample opportunity to observe Mr. Patten in court during his testimony. Near the outset of that testimony, he directed counsel for the government to keep his voice up, as the judge observed that the 82–year old Mr. Patten was so hard of hearing that he was forced to wear a hearing aid. The judge also heard Mr. Patten's testimony concerning the nature of the direct physical attack, in which Billingsley rushed up to Mr. Patten, drew a pistol, and forced him inside to turn off the house's alarm, then forced him back to the garage while the defendant and Brown searched Patten's car for the title. Upon reviewing the record including the testimony concerning the physical assault on the 82–year old victim Patten, in light of the trial court's opportunity to observe Mr. Patten while he was testifying, we conclude that there was more than adequate basis for the trial court to determine that Mr. Patten was in fact a "vulnerable victim" to the defendant's attack on account of his age and physical condition.

■ Billingsley also contests the finding that he "knew or should have known" that Mr. Patten was unusually vulnerable. He focuses on Ward's testimony that, when he, Billingsley and Brown were walking by Patten's house on October 14, they did not see who the driver of the Bonneville was when it pulled in front of them into the driveway they were about to cross. The defendant argues that there was no evidence to demonstrate that he knew Mr. Patten was elderly and that he "targeted" Patten on account of his elderly status. In our opinion, this argument fails. We have examined the record and conclude that the evidence supports the conclusion that Billingsley knew or should have known that the elderly man was unusually vulnerable to the attack and decided to take the car from him *after* having had the opportunity to observe that Mr. Patten was an elderly man. The record demonstrates that, on the night they took the car, Billingsley (along with Brown) waited for Patten as he pulled the Pontiac into his garage and rushed him after he had walked from his garage and approached his back door. Mr. Patten testified that, on October 15, he was accosted as he was stepping up onto the

stoop of his back door, which was approximately twenty-five feet away from his detached garage. He also testified that the garage lights were on. Thus, Billingsley had the opportunity to observe Mr. Patten walking from his garage to the back door of his house before engaging him in a direct physical attack, even if we were to believe that he did not see him on October 14. Billingsley has not argued that Mr. Patten appeared to be unusually youthful or fit looking for a man of his age, and we disagree with the defendant's self-serving unsupported assertion that it is "nonsensical to believe that the knowledge of the victim's age obtained in [the time Patten walked from his garage to his back door] meets the Guideline requirement that the defendant knew or should have known that the victim was unusually vulnerable." Br. of Appellant at 14. In that period, Billingsley had ample time to observe the elderly man as he walked toward his back door and either back off or proceed with the assault based on his observation of the victim. *See United States v. Pearce,* 967 F.2d 434, 435 (10th Cir.1992) (vulnerable victim enhancement applies where the defendant targets victim "because he knows that the victim's characteristics make the victim unusually vulnerable to that criminal conduct").[4] Further, Billingsley had the opportunity to observe Patten while forcing him to walk to the garage and while questioning him about the title, and could have withdrawn from the attack at any point. The trial judge acknowledged the importance of the direct physical attack in his decision when he described how Billingsley "by brandishing a firearm which he possessed, he took, through intimidation, the 1993 Bonneville from the 82–year–old victim." Jan. 26 Tr. at 11. Upon review of the record, we disagree with the defendant's argument and find no error in the enhancement of Billingsley's sentence under the "vulnerable victim" guideline.

### B. The "organizer or leader" enhancement

Defendant Billingsley next argues that the trial court erred in imposing a two-level sentence enhancement based on his role as an "organizer or leader" pursuant to § 3B1.1(c) of the guidelines.

■ A two-level enhancement is called for under § 3B1.1(c) where the defendant's role in the offense was that of an "organizer, leader, manager, or supervisor." These terms are not specifically defined in the guidelines, but application note four lists seven factors relevant to the determination of whether such an enhancement is warranted:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). *See also United States v. Bush,* 79 F.3d 64, 67 (7th Cir.1996). "We review the district court's finding that an enhancement is warranted by a defendant's aggravated role in the offense for clear error." *United States v. Johnson–Dix,* 54 F.3d 1295, 1309 (7th Cir.1995).

■ The trial judge made findings concerning Billingsley's leadership status at both the initial and the second sentencing hearings. In sum, he found that Billingsley: 1) planned and attempted the carjacking on October 14; 2) in his leadership role he excluded Ward, who had not gone along with the plan on the 14th, when he returned with Brown on the 15th; 3) took the car at gunpoint from Patten and decided to drive it across state lines to see his girlfriend in Ames, Iowa; and 4) recruited Ward to go along with him to Ames. Billingsley argues on appeal that these findings do not support an enhancement under 3B1.1(c) because they

4. The commentary to § 3A1.1 was amended in the 1995 version of the guidelines, and the language stating that the adjustment applies "where an unusually vulnerable victim *is made a target* of criminal activity by the defendant" was removed. It was replaced by language stating that the enhancement applies where the defendant "knew or should have known" that the victim was unusually vulnerable. See 1995 U.S.S.G. § 3A1.1, comment. (n.2); *United States v. Cruz,* 106 F.3d 1134, 1136–40 (3d Cir.1997). The government has noted this amendment in its brief, but does not ask us to reconsider the "target" requirement.

do not demonstrate that the defendant organized or controlled any of the other participants. We agree with the government, however, that Billingsley's argument fails to take into account the defendant's role in the overall series of events, not simply the offense of conviction.

When determining whether an "organizer or leader" enhancement under § 3B1.1 is warranted, the introductory commentary to Part B instructs us that "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct) ... and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G., Ch.3, Pt.B, intro. comment. Relevant conduct, according to § 1B1.3(a), includes conduct "that occurred during the commission of the offense of conviction, *in preparation for that offense,* or in the course of attempting to avoid detection or responsibility for that offense" (emphasis added). The trial court's findings are supported by evidence that, on October 14, it was Billingsley's idea to attempt to lure Mr. Patten out of his home so Billingsley could steal the car for his trip to Iowa, and that he engaged both Ward and Brown on the 14th to assist him. When Ward backed out and refused to comply with Billingsley's request that he knock on the door, the plan was put off for a night. The next night, after having excluded Ward for his refusal to assist in the carjacking on the 14th, the defendant and Brown returned to Patten's home. On that occasion, assisted by Brown, the defendant forcibly removed the car and the title from Mr. Patten. Although Brown assisted Billingsley in taking the vehicle, he did not accompany Billingsley on the trip to Iowa.[5] Finally, during the trip to Iowa, the defendant was the sole driver of the car, which he had been the one to express interest in, the entire way. In sum, the record could not be any more clear that the whole episode was Billingsley's idea—he was the organizer of the offense, recruited accomplices to assist him in initially attempting and later carrying out the offense, was the main participant in the commission of the offense, and received the largest share of the benefit (in terms of his ability to visit his girlfriend) of the offense.

■ It is true that the judge did not explicitly find that Billingsley "controlled" either Ward or Brown, but as we noted recently in Bush:

> Although control over other participants is a significant factor, the overall focus under § 3B1.1 is relative responsibility within a criminal organization. No single factor is essential to determine whether a sentence should be adjusted under § 3B1.1, nor must equal weight be given to each factor. Thus, for example, even if a defendant did not exercise control, an enhancement under § 3B1.1 may apply so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role.

79 F.3d at 67 (citation and internal quotation marks omitted); *see also United States v. Granado,* 72 F.3d 1287, 1290 (7th Cir.1995).[6]

**5.** Since Brown participated in the carjacking under Billingsley's direction, it was clearly proper for the district judge to conclude that Brown's assistance provided further evidence of Billingsley's leadership status. *See United States v. Peters,* 59 F.3d 732, 734 (8th Cir.1995) (3B1.1 enhancement proper where defendant "came up with the plan, recruited [two accomplices] to participate, and continued to provide substantial direction during the life of the plan").

**6.** Billingsley relies on *United States v. Fones,* 51 F.3d 663 (7th Cir.1995), for the proposition that the district court must find that a defendant exercised control over another participant to warrant a § 3B1.1 enhancement. As we noted in that case, "efforts of recruitment would likewise be sufficient to establish control over a participant under [sec. 3B1.1]." 51 F.3d at 670

n. 5. "Participant" is defined in the guidelines as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1, comment (n.1). Billingsley has not argued that Ward and Brown were not participants. Given his recruitment of both to engage in the taking of the car from Mr. Patten, along with the fact that stealing the Pontiac was his idea, he directed Ward and Brown's actions on October 14th, excluded Ward from the theft operation the next night, and was in control of and drove the car the entire way to Iowa, we are of the opinion that the evidence supports the conclusion that Billingsley exercised control over Brown and Ward's actions.

In this regard, we note that, in *Fones,* a case in which we vacated an enhancement under § 3B1.1(b), we relied *specifically* on the district court's finding that the defendant "had no con-

We conclude that there was no clear error in the enhancement under § 3B1.1.

### C. The upward departure for possession of a handgun and ammunition

Prior to the second sentencing hearing, the district judge notified the parties that he was considering an upward departure. The court concluded that Billingsley had transported the gun and ammunition found in the squad car across state lines, and that an upward departure was therefore appropriate under § 5K2.6, which provides grounds for an upward departure if "a weapon or dangerous instrumentality was used or possessed in the commission of the offense." To determine the proper extent of departure, the judge looked to § 2B3.1, the guideline applicable to robbery. Section (b)(2) of the guideline directs a five-level enhancement "if a firearm was brandished, displayed, or possessed" during the offense. The judge found that this was an appropriate amount of enhancement, since Billingsley "had previously used that firearm in the carjacking" of Mr. Patten's Pontiac, and increased the defendant's offense level from a fifteen to a twenty. Billingsley claims on appeal that the judge erred in looking to § 2B3.1 for guidance in determining the appropriate amount of enhancement to apply.

■ The sentencing court's decision to depart from the guidelines is reviewed under an abuse of discretion standard. *Koon v. United States,* —— U.S. ——, ——–——, 116 S.Ct. 2035, 2047–48, 135 L.Ed.2d 392 (1996); *United States v. Purchess,* 107 F.3d 1261, 1271 (7th Cir.1997); *see United States v. Wyatt,* 102 F.3d 241, 246 n. 7 (7th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1325, 137 L.Ed.2d 486 (1997). "A sentencing court may depart from the Guidelines if it 'finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *United States v. Hogan,* 54 F.3d 336, 341 (7th Cir.1995) (quoting 18 U.S.C. § 3553(b)). "When a court

finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch.1, Pt.A, intro. comment. 4(b).

■ As the Supreme Court stated in *Koon,* "[a] district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." —— U.S. at ——, 116 S.Ct. at 2046. Where, as here, we review the *extent* of the departure, as opposed to the validity of the decision to depart in the first place (which Billingsley does not challenge), we examine only whether the extent of the departure was "reasonable." *United States v. Horton,* 98 F.3d 313, 316 (7th Cir.1996) (citing *United States v. Ferra,* 900 F.2d 1057, 1061 (7th Cir.1990) and 18 U.S.C. § 3742(e)(3), (f)(2)).

When determining how far to depart in a given case, district courts are instructed to "link" the extent of a departure to "the structure of the guidelines." *Horton,* 98 F.3d at 317; *see also Hogan,* 54 F.3d at 342; *United States v. Sarna,* 28 F.3d 657, 661 (7th Cir. 1994). In other words, as explained in Horton:

> [A] district court determines the extent of an upward departure by comparing the seriousness of the aggravating factors that motivate the departure with the adjustments in base offense level prescribed by the guideline provisions that apply to conduct most closely analogous to the defendant's offense conduct.... By linking the extent of the departure to the structure of the guidelines in this way, a district court avoids the types of large disparities in sentencing that the guidelines were designed to prevent, and gives the appellate court a basis for conducting a principled review of the reasonableness of the extent of the departure.

98 F.3d at 317 (citations omitted) (emphasis added). The second sentence of § 5K2.6 provides further guidance concerning the fac-

---

trol or authority over any other participants." 51 F.3d at 670. No such finding was made in this case.

tors a court should consider when determining the extent of the increase. "The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others." U.S.S.G. § 5K2.6, p.s.

In the present case, the district court expressly performed the "linkage" our cases have contemplated. The judge determined that Billingsley "brandish[ed] a firearm which he possessed, [and] took, through intimidation, this 1993 Bonneville from the 82–year–old victim." The judge found that, after "displaying the prize of his crime to his friend [Ward]," Billingsley transported the gun and ammunition across state lines to Iowa, and attempted to hide the gun and the ammunition in the squad car in Iowa. He determined that the Commission had not taken possession of a gun into account in formulating the offense level under § 2B1.1 (a finding Billingsley has not challenged), and expressly looked to another guideline provision to determine the appropriate extent of departure. He then determined that the five-level enhancement called for under the Robbery guideline § 2B3.1(b)(2)(C) provided the appropriate degree of departure, and adjusted the defendant's sentence accordingly.

Billingsley has suggested that the court should have looked to other guidelines which provide a lower enhancement for possession of a weapon. For example, he claims that either § 2A2.2(b)(2), which provides for a three-level enhancement when a firearm is "brandished or its use was threatened" during Aggravated Assault, or § 2E2.1(b)(1)(C), providing a three-level enhancement when a firearm is "brandished, displayed, or possessed" during the offense of Extortionate Extension of Credit, should have been used. Billingsley's argument fails to take into account that "the district court's findings on the degree of departure are given deference." *United States v. Sarna*, 28 F.3d 657, 661 (7th Cir.1994). Here, the sentencing judge determined that, based on Billingsley's use of the gun in stealing the car by threat of

force from Mr. Patten, the Robbery guideline provided the closest link in the guidelines to Billingsley's offense.[7] In determining which guideline provided the best link, the judge was not, as Billingsley suggests, required to put blinders on to the fact that Billingsley had previously used the gun to effectuate the taking of the car which he then transported across state lines. In this regard, defendant's reliance on *United States v. Baldwin*, 5 F.3d 241 (7th Cir.1993) is misplaced. Baldwin addressed a departure under § 5K2.6 where the defendant *did not* use or possess the dangerous weapon during the offense of conviction. 5 F.3d at 242. We held that "5K2.6 … contemplates departures only when the dangerous weapon was possessed during the offense of conviction." *Id.* In the instant case, as the defendant has conceded, the trial judge was careful to base the departure on Billingsley's possession of the handgun when he transported the car across state lines. Once that finding has been made by the judge, we do not think (and Billingsley has not cited any cases suggesting) that the judge was prohibited from considering, for purposes of determining which guideline to link the departure to, Billingsley's use of the gun in taking the Pontiac. *See* U.S.S.G. § 1B1.4, comment. (backg'd) ("[I]nformation that does not enter into the determination of the applicable guideline sentencing range may be considered in determining whether *and to what extent* to depart from the guidelines." (emphasis added)); *Koon,* —— U.S. at ——, 116 S.Ct. at 2046 (noting that 18 U.S.C. § 3742(e) requires courts of appeals to "give due deference to the district court's application of the guidelines to the facts"); *United States v. Gaddy,* 909 F.2d 196, 200 (7th Cir. 1990) (possession of gun during commission of offense part of " 'background, character and conduct of the defendant' relevant under § 1B1.4 to a decision to depart" (quoting U.S.S.G. § 1B1.4)). We hold that it was proper for the sentencing judge to depart upward based on Billingsley's possession of the handgun and ammunition, and we further conclude that the degree of departure was reasonable.

---

7. At the sentencing hearing, defendant's counsel agreed that § 2B3.1 was the provision the court should look to if it decided to depart.

## IV. Conclusion

We affirm the sentence imposed.