In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3537

United States of America,

Plaintiff-Appellee,

v.

DeMarco Williams,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 208-2--Joan B. Gottschall, Judge.

Argued June 12, 2001--Decided July 23, 2001

Before Manion, Diane P. Wood, and Williams,
Circuit Judges.

Diane P. Wood, Circuit Judge.  DeMarco
Williams pleaded guilty to kidnapping and
carjacking, in violation of 18 U.S.C.
sec.sec. 1201(a)(1) and 2119. This appeal
relates only to the stiff sentence he
received for those crimes--315 months'
imprisonment, five years' supervised
release, a fine of $5,000, and a special
assessment of $200. The length of the
sentence was attributable in part to two
adjustments in his offense level that the
district court made under the Sentencing
Guidelines, one for the vulnerability of
the victim, U.S.S.G. sec. 3A1.1(b)(1),
and the other for the severity of her
injuries, U.S.S.G. sec. 2B3.1(b)(3).
Although he failed to make any objection
to these adjustments at sentencing,
Williams (through different counsel) now
argues that each one amounted to plain
error. He also asserts that the district
court failed properly to inform him of
his right to allocution before
sentencing, as required by Fed. R. Crim.
P. 32(c)(3)(C). We find no reversible
error in any of these points and thus
affirm the judgment of the district
court.

I

  Williams's crime was indeed a brutal

one. According to his written confession, he arranged to meet with a man named Nate on the south side of Chicago on the morning of Friday, March 13, 1998; Nate had promised to help him steal a car. The two spotted a 1995 Chevy Corsica heading into an alley garage and decided that this was their target. They approached the car and Nate pointed a gun at the driver, 71-year-old Mary Holmes. Holmes had just returned from work and was locking her steering wheel with "The Club," a popular anti-theft device. Nate forced her to remove the Club, and then, not content with simply taking the car, he and Williams bound up the unfortunate Holmes with duct tape and put her in the trunk of the car.

The two then drove the car to rural Westville, Indiana, some two hours away. According to Holmes's videotaped statement, she managed to remove the duct tape while she was in the trunk, but when they stopped the car and pulled her out, Nate re-taped her and Williams delivered the ominous message "This is where we brought you to kill you." With that, the two men led Holmes to a pool of melting ice and snow near the side of the road, where Nate hit her on the head five or six times with the Club. There they left her, bleeding in the snow, and drove back to Chicago. Holmes managed to drag herself out of the ditch and flag down a UPS driver, who took her to the UPS center. The people there summoned an ambulance for her, which transported her to a hospital in Michigan City, Indiana.

By the time she reached the hospital and was treated, Holmes had lost 2.5 pints of blood. In the end, she needed approximately 300 stitches to close the head wounds, as well as a 1/4 inch drain inserted in her head. Although she did not suffer a skull fracture, the incident left her with long-term after-effects including dizziness, difficulty concentrating, and frequent, severe headaches.

Law enforcement authorities caught up with Williams approximately two weeks after the Corsica was stolen and Holmes beaten, when he was stopped by a police officer in Oak Park, Illinois, for a routine traffic violation. The officer quickly learned that the Corsica was stolen, and not too much later Williams

confessed to both the carjacking and the kidnapping of Holmes. After some initial indecision, Williams decided on the second day of his trial to enter a blind guilty plea, which the district court accepted. The presentence report was then prepared. It detailed the injuries Holmes had suffered, both at the time and long-term. It also noted that Dr. Anne Hollingsworth, who was one of the physicians who treated her, expressed the opinion that Holmes "could have" suffered more serious blood loss and even could have died of exposure in the ditch. The PSR proposed upward adjustments based on Holmes's status as a vulnerable victim and the severity of her injuries.

Williams did not object specifically to those two adjustments. Instead, he filed a "Position Paper as to Sentencing Factors" in which he requested a reduction for acceptance of responsibility and a downward departure based on his diminished mental capacity. The district court denied both those requests, after which the following colloquy took place:

[COURT]:  Okay. [Defense counsel], are there any other issues that you wish to address?

[DEFENSE COUNSEL]:  I will for[ ]bear, Judge.

[COURT]:  Okay. Mr. Williams, is there anything that you would like to say?

DEFENDANT WILLIAMS:  No, your Honor.

With that, the court adopted the factual findings and recommendation of the PSR and increased Williams's offense level by two because of Holmes's "obvious advanced age and the fact that she was alone at the time of the offense," and by another five levels because she had suffered "permanent or life-threatening" injuries within the meaning of sec. 2B3.1 (b)(3). In the end, Williams had a total offense level of 39 and a criminal history category of I, for a Guidelines range of 262-327 months. As noted already, the court decided on a sentence of 315 months.

II

The government argues that we should not

reach either of Williams's sentencing points because he waived them at sentencing. Williams concedes that he failed to object to the two adjustments, but urges us to consider this point merely forfeited and thus subject to plain error review before this court. This is a close call. On the one hand, we have held that a defendant's words (either spoken personally or through his attorney) to the effect that he has "no objections" to a PSR operate as a full-fledged waiver of all objections and foreclose appellate review. See, e.g., United States v. Richardson, 238 F.3d 837, 841 (7th Cir. 2001), cert. denied, No. 00-9604, 2001 WL 460282 (U.S. May 24, 2001); United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000). On the other hand, a failure to object normally constitutes only a forfeiture of the point. Forfeiture has the serious consequence of changing the standard of appellate review to the demanding "plain error" level, but it does not render the issue completely unreviewable. See United States v. Olano, 507 U.S. 725 (1993).

When the judge asked whether there were other issues defense counsel wanted to address, the lawyer merely said that he would "forbear." Conspicuously absent in this exchange is any mention of the word "objections." Had the judge asked whether he had any more objections and this had been his response, the argument for waiver would have been stronger. The same would have been true if the lawyer had answered the judge's inquiry with a statement like "we have no more objections." An invitation to address issues, and a statement merely indicating forbearance, are far more ambiguous. Waiver should not be found lightly; itoccurs only if there is an intentional relinquishment of a known right. We think it best to construe the record here as presenting only forfeiture, and we proceed to a plain error review of the district court's decisions.

A. Vulnerable Victim, sec. 3A1.1(b)(1)

Williams argues that the district court made a legal error in applying this adjustment, insofar as the judge regarded the victim's age alone as sufficient to justify a finding of vulnerability. He points to a number of cases from other

circuits that, he argues, stand for the proposition that membership in the class of the elderly is never enough by itself to support this enhancement; instead, the court must find age "plus" some additional particular factor about the individual victim. See, e.g., United States v. McCall, 174 F.3d 47 (2d Cir. 1998); United States v. Tissnolthtos, 115 F.3d 759 (10th Cir. 1997).

We are not as convinced as Williams that our sister circuits have adopted such an inflexible rule, but in the end, we do not need to parse their decisions to the last detail. That is because this circuit has already considered the way in which age should be used for purposes of the vulnerable victim enhancement, see United States v. Billingsley, 115 F.3d 458 (7th Cir. 1997), and we are satisfied that Billingsley was sound and should govern here. Billingsley involved facts remarkably similar to those now before us: an elderly victim (there 82 years old) had his car stolen by the defendants; he was terrorized during the act, although was fortunate enough not to be kidnapped too; and the district court decided at sentencing that the vulnerable victim enhancement was proper. On appeal, the defendant argued that the enhancement should be found to be unavailable unless the elderly victim was "unusually" vulnerable, but this court rejected that proposition. Citing our earlier decision in United States v. White, 903 F.2d 457 (7th Cir. 1990), we noted that it is obvious that the elderly are usually less capable of resisting physical attack than the younger. That fact, taken together with the nature of the crime charged and the trial court's opportunity to observe the victim and assess whether he fit that pattern, was enough to sustain the district court's decision. See 115 F.3d at 463.

The same rationale applies here. Indeed, the Billingsley court might have noted that Application Note 2 to sec. 3A1.1 (b)(1) provides further support for this approach. The note defines "vulnerable victim" for purposes of the guidelines as

a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under sec. 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age,

physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

The note does not say "age" and "particular susceptibility"; it says "age" or "particular susceptibility".

This is not to say that the enhancement provided by sec. 3A1.1(b)(1) is always required when the victim is elderly. There still must be some link between the vulnerability and the characteristic in question, here age. In the note's words, the vulnerability must be "due to" the age. But, as we found in Billingsley, an elderly person, alone, will be especially vulnerable to a crime involving physical violence. We therefore find no error in the district court's decision, plain or otherwise, though we add that it would be highly unlikely in any event that we would find plain error in a district court's decision to apply a directly applicable decision from this court.

B. Permanent or Life-Threatening Injury, sec. 2B3.1(b)(3)

This guideline requires a six-level increase in the offense level where a victim suffers "permanent or life-threatening bodily injury." The district court found that Holmes's injuries qualified for the higher level, but increased Holmes's offense level only by five in light of sec. 2B3.1(b)(3)'s eleven-level cap on combined adjustments for weapon involvement and severity of injury (Williams also received a six-level increase for using a firearm). We once again find that this is neither plain error nor any other kind of error.

Once again, we find the definitions in the guidelines to be helpful. The general application principles found in sec. 1B1.1 include, in Application Note 1(h) to that section, a definition of "permanent or life-threatening bodily injury":

"Permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss orsubstantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is

likely to be permanent. In the case of a kidnapping, for example,maltreatment to a life-threatening degree (e.g., by denial of food or medical care) would constitute life-threatening bodily injury.

Williams argues only that the evidence shows that Holmes's injuries fell short of this standard because the doctorsmerely said that her injuries "could have" been life-threatening. But we do not find this a fair reading of the medical evidence as a whole, and certainly not a reading that the district court was compelled to accept.

The evidence showed that Holmes was beaten over the head with the Club, which is a metal rod, so severely that she needed 300 stitches to repair the wounds. She bled so profusely that she lost 2.5 pints of blood, more than 25% of total blood volume for an average woman. See, e.g., American Red Cross website, http://www.bloodct.org/plasma.htm ("About 7 percent of a person's weight is blood. An average size man has about 12 pints of blood. An average size woman has about 9 pints."). She was left alone in an icy ditch, tied up with duct tape, to fend for herself while she was in this injured state. We find it impossible to say that, in the words of the Application Note, she was not facing a "substantial risk of death." The slightest coincidences could have led to a far unhappier result: had she not managed to get herself out of the ditch, the UPS driver may not have seen her; had he driven by an hour later, it might have been too late to save her. We do not know, but the Note does not speak in certainties; it speaks of risk, and Holmes undoubtedly faced life-threatening risk.

Other evidence indicated that the beating Holmes endured permanently impaired her mental faculties. In addition, we note that the Application Note identifies "maltreatment to a life-threatening degree" as one example of life-threatening bodily injury. If denial of food or medical care qualify, it is hard to see how more aggressive maltreatment such as being beaten over the head repeatedly with a metal object would not. The Ninth Circuit has upheld the use of this enhancement on similar facts, see United States v. Hinton, 31 F.3d 817, 826 (9th Cir. 1994). See also

United States v. Morgan, 238 F.3d 1180, 1183-84, 1187-88 (9th Cir. 2001) (remanding for consideration whether circumstances of carjacking amounted to life-threatening maltreatment). We find no plain error in the court's decision to apply this adjustment to Williams's sentence.

III

Last, we consider briefly Williams's argument that the district court did not adequately comply with Fed. R. Crim. P. 32(c)(3)(C), which requires a sentencing court to "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." As the brief excerpt from the transcript we reproduced above shows, the court merely said "Mr. Williams, is there anything that you would like to say?" Williams personally replied "No, your Honor." This was flawed, according to Williams, because the court did not specifically highlight "mitigation of punishment" as a topic Williams might wish to address.

Rule 32(c)(3)(C) does not purport to set out a script that the district courts must follow when advising defendants of their right to allocution. See United States v. Stuver, 845 F.2d 73, 75 (4th Cir. 1988). Instead, the substance of what occurred is what counts, and we see no problem with the substance here. First, it is clear that the court addressed Williams himself, not his lawyer or any other representative. That satisfies the first clause of the rule, which calls for the court to "address the defendant personally." In the context of this part of the proceedings, it was clear that the court was inviting Williams to speak about anything he wanted to that pertained to sentencing. There was thus no risk of a misunderstanding, such as the risk that caused the court in United States v. Echegollen-Barrueta, 195 F.3d 786, 789 (5th Cir. 1999), to require resentencing. In Echegollen-Barrueta, the court's comment came immediately after a hearing on the defendant's escape attempt, and the defendant may have thought that an invitation to speak was limited to the issue of escape. Nothing here created any such ambiguities. Although it never hurts

to follow the language of the rule more closely, and can even help to avert arguments like this one on appeal, we conclude that no specific formula of words is required to satisfy Rule 32. The record as a whole here shows that the court satisfied its obligation and that Williams's right to allocution was not denied.

We therefore Affirm the judgment of the district court.