In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 06-4316

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

YOUSEF PIRA,

*Defendant-Appellant.*

―――――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 1137—**Wayne R. Andersen**, *Judge.*

―――――――――

ARGUED SEPTEMBER 28, 2007—DECIDED JULY 31, 2008

―――――――――

Before ROVNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* In November 2002, federal agents executed a search warrant at the Chicago residence of Yousef "Joe" Pira. The agents' suspicions proved to be justified: they discovered 52 credit cards, 25 photocopied credit cards, and personal identification information related to 53 people. In Pira's home and during a later search of his computer, agents also found an extensive collection of contraband, including bank cards, checkbooks in various names, two postal "Arrow" locks (the standard lock used on mailboxes across the city of Chicago by the U.S. Postal Service), a magnetic encoder, four boxes of check stock, Social Security cards, stolen and

counterfeit checks (including the image of a $1,000,000 counterfeit check on Pira's computer), fraudulent money orders, and much more. Pira had hidden many of these items in a cubbyhole in his young daughter's bedroom.

Based on what was seized as a result of the search and on statements Pira made to U.S. Secret Service Special Agent Michael Bush during the search, a federal grand jury issued a four-count indictment charging Pira with knowing possession of at least 15 counterfeit, unauthorized access devices with the intent to defraud, in violation of 18 U.S.C. § 1029(a)(3); knowing production, use, and trafficking in at least one access device with the intent to defraud, in violation of 18 U.S.C. § 1029(a)(1); knowing possession of device-making equipment with intent to defraud, in violation of 18 U.S.C. § 1029(a)(4); and knowing possession of a mail lock adopted by the U.S. Postal Service with intent to use, sell, or otherwise dispose of it and cause it to be used, sold, or otherwise disposed of unlawfully and improperly, in violation of 18 U.S.C. § 1704.

Pira proceeded to trial on these charges, but on the second day of trial he changed his plea to guilty on all four counts of the indictment. Though he later attempted to withdraw his guilty plea, that request was denied. Pira's case then moved to sentencing. After an evidentiary hearing, the district court sentenced Pira to 78 months' imprisonment. On appeal, Pira challenges only his sentence, which we affirm.

**I**

Considering the vast and varied assortment of access devices, encoding devices, counterfeit documents, and other contraband found in Pira's home and on his com-

puter, it is perhaps unsurprising that, during the search, Pira admitted to Special Agent Bush that he manufactured and possessed counterfeit checks and money orders, and that he also "boosted" credit cards. As Agent Bush recounted at the sentencing hearing, Pira's "boosting" scheme involved obtaining a legitimate credit card from an account holder who had little or no available credit remaining on her credit limit, and then making fraudulent payments to the credit card issuers using other credit cards or counterfeit checks to restore the available credit. After restoring the credit, Pira would make charges until the available credit was once again depleted. As the district court pointed out during sentencing, this scheme revealed a close relation between Pira's use of fraudulent credit cards and his use of counterfeit checks and money orders.

Pira admitted during the search of his residence on November 22, 2002, that he had printed two counterfeit cashier's checks, one drawn on TCF National Bank and the other on Bank One. Both of these checks, Pira stated, remained on his laptop computer, which he had used to create them. He had printed the checks for other people, but he was uncertain whether they were able to cash them.

Following this lead, Secret Service agents conducted a forensic examination of Pira's computer. In addition to finding two TCF Bank cashier's checks for $54,000 and $4,800, the agents also discovered the image of a counterfeit check issued by Bank One and made payable to a man named Salem S. in the amount of $1,000,000. The date on the check was November 12, 2002. Testifying at his sentencing hearing, Pira acknowledged that he created the image of the $1,000,000 check, but he denied ever printing the check or attempting to cash it.

Instead, he claimed, he had prepared it in connection with his work for the Secret Service as an informant. Though it is true that Pira once was a confidential informant for the Secret Service, the two Secret Service agents responsible for working with Pira during his cooperation period, Agent Bush and Special Agent Matthew McCloskey, testified that they had no prior knowledge of the items found in Pira's residence, and that the items were not related to Pira's prior cooperation with the Service. Pira nonetheless has insisted throughout these proceedings that the items found in his apartment during the search were the remnants of his previous status as a confidential informant.

Pira did not dispute that the other counterfeit checks had been found on his computer, but he said that he did not remember creating them. He admitted to helping with the preparation of 450 fraudulent money orders, each in the amount of $750. These he mailed to another man, who, in return, was to pay Pira for the printing job.

The sentencing hearing also featured the testimony of Zach Costinos, who said that he worked for Pira from 1990 until Pira's arrest in 2002. During that time, Costinos stated, roughly two to three times per week Pira provided Costinos with re-encoded credit cards for the purpose of making fraudulent purchases. Pira instructed Costinos to use the cards for purchasing items such as computers, laptops, and other small electronics at stores like Circuit City and Best Buy. Costinos then sold the items and split the proceeds with Pira; typically, Costinos received 15-20% of the proceeds, while the other 80-85% went to Pira. During these years of working together, Pira also tutored Costinos on how to obtain the credit cards and account information and how to use a computer and

magnetic-strip device to re-encode the cards with new information. Costinos watched Pira perform this re-encoding process on at least one occasion.

Costinos also worked for Pira as a "runner" to cash and deposit stolen or counterfeit checks. To facilitate this activity, Pira helped Costinos obtain a false driver's license, with a fake name (George Zoto), date of birth, and Social Security number. After taking Costinos to a Secretary of State's office to obtain the license, Pira instructed Costinos to use the phoney ID to open bank accounts under the alias. Costinos did so, establishing accounts as George Zoto at TCF Bank, Liberty Bank, and Plaza Bank. Pira then provided Costinos with checks to deposit into those accounts. The checks included counterfeit checks as well as checks that Pira had stolen from the mail using his "Arrow" key. Before the banks learned that the checks were no good and closed Zoto's accounts, Costinos managed to deposit seven checks, in amounts ranging from just over $3,000 to just under $9,000, and to withdraw approximately $6,500.

The Presentence Investigation Report ("PSR") calculated the actual loss resulting from Pira's offenses of conviction at $41,258.73. That figure is based on losses reported by the fraud departments for the issuing banks of nine out of the 89 total credit card numbers found in Pira's apartment. The PSR also included in its assessment of relevant conduct the following items of intended loss:

 – $258,755.35 stemming from a series of counterfeit checks that Pira deposited or attempted to deposit with an associate, George Brotsis, from Rockford;

 – $13,060 from four fraudulent checks that Pira provided to Costinos, payable from an account in the name of a bar, Arcade Dreams. (At sentencing, the Govern-

ment sought to include only $9,500 of this amount in the loss calculation.)

– $27,579.44 in connection with five other stolen or counterfeit checks that Pira provided to Costinos.

– $1,396,300 resulting from the preparation of counterfeit money orders and counterfeit checks found on Pira's computer. This includes the 450 fraudulent money orders in the amount of $750 each (total of $337,500), the counterfeit TCF Bank cashier's checks in the amounts of $54,000 and $4,800, and the counterfeit Bank One bank check in the amount of $1,000,000.

– $182,253.21 resulting from two counterfeit checks passed by an individual named Abdel Alsabih in December 2002. (Because no evidence directly linked Pira to these checks, the Government did not seek to have this amount included in the loss calculation at sentencing.)

In total, the PSR concluded that the loss resulting from the offense of conviction and related conduct was $1,919,206.63. Following an evidentiary hearing, the district court accepted the PSR's actual loss calculation and also concluded that most (but not all) of the uncharged conduct constituted relevant conduct within the meaning of the U.S. Sentencing Guidelines ("USSG") and therefore had to be added into the final loss calculation. The district court expressly noted that it was including the $1,000,000 counterfeit check, but that it was excluding the loss stemming from the Brotsis checks. The resulting total was $1,733,943.02, placing the loss in the $1,000,000 to $2,500,000 range that merits a 16-level enhancement under § 2B1.1(b)(1)(I) of the Guidelines.

The district court also applied a two-level enhancement under USSG § 3B1.1 for Pira's role as an organizer or leader

of the criminal conduct. Finally, after addressing the requirements of 18 U.S.C. § 3553(a), it imposed a sentence of 78 months' imprisonment. Pira challenges that sentence on three grounds: (1) improper calculation of relevant conduct; (2) inappropriate imposition of the organizer or leader enhancement; and (3) failure properly to consider the statutory factors of § 3553(a). We examine each point in turn.

## II

The court's computation of Pira's relevant conduct had the greatest effect on his sentence, and so we take up that topic first. We review the district court's decision to include uncharged activity as relevant conduct only for clear error. *United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004). In order to fall within the terms of USSG § 1B1.3, the related conduct must be attributable to the defendant and be part of the same course of conduct as the charged offense or, alternatively, part of a common scheme or plan. *United States v. Ojomo*, 332 F.3d 485, 489 (7th Cir. 2003). In Pira's case, the district court's decision to add intended loss to the actual loss resulted in a 16-level enhancement to his offense level.

Pira first asserts that the district court erred by making its findings only by a preponderance of the evidence. Even if that is the correct standard of proof some of the time, Pira argues that an enhancement as significant as his ought to be supported by the heftier "clear and convincing" standard. Although the circuits were split on this issue, Pira concedes that this court has rejected his position. See *United States v. Reuter*, 463 F.3d 792 (7th Cir. 2006). He is raising the point merely to preserve it, which he has

now done. We therefore proceed under the preponderance standard.

Even from this standpoint, Pira says, the district court's relevant conduct calculation was clearly erroneous because it included unrelated acts and was based on unreliable evidence. To evaluate this argument, we must consult the sentencing proceedings. At Pira's sentencing hearing, the court began by explaining what it was inclined to do. It then gave Pira and his counsel the opportunity to offer any explanation of mitigating factors that Pira wished to present. Once the Government, Pira, and Pira's counsel had all spoken, the judge decided to adjourn the proceedings briefly while he considered the evidence. After returning, he adjusted his initial calculations and reduced the amount of intended loss by nearly $200,000, taking the total down from just over $1,900,000 to $1,733,943.02. (It is not entirely clear how the district court arrived at this new figure, for while it said that the reduction was the result of its elimination of the Brotsis checks from the intended loss amount, the PSR listed the amount of those checks as $258,755.35. Thus, their elimination would result in a new loss calculation of $1,641,244.65. The court's number, $1,733,943.02, reflects a reduction of only $166,056.98. This mathematical misalignment is puzzling, but it is also harmless, for both the number the district court reached and the figure our arithmetic suggests are well within the range of $1,000,000 to $2,500,000 that merits a 16-level enhancement under the advisory Guidelines.) The judge also reduced Pira's criminal history category from II to I. The result was a new, lower Guidelines range, dropping from 87 to 108 months down to 78 to 97 months. Ultimately, the court sentenced Pira to 78 months, the bottom of the new range.

On appeal, the main bone of contention has been the image of the check for $1,000,000 found on Pira's computer, because the district court's decision to include that amount in the "intended loss" figure makes all the difference. Though Pira argued throughout that he never attempted or intended to print or cash this check, the district court was under no obligation to accept Pira's word for this. The court did not clearly err when it decided that, "given all the surrounding conduct and given the possibility, as the Government raises, of negotiating a check of that size in other countries, it seems to me that [the $1,000,000] check was produced not as a joke but with the hope that at some point it could be printed out and negotiated."

Pira also claims that the counterfeit checks were not sufficiently related to the charged scheme of credit card fraud to be included as intended loss. Pira's own statements about his credit card "boosting" scheme, however, support the district court's conclusion that the check and credit card schemes were linked. The district court discussed its reasoning at length, noting that these activities were connected by similar characteristics, players, and victims. We find no error, clear or otherwise, in its decision.

Finally, Pira complains about the reliability of the evidence supporting the court's relevant conduct determinations. The only point he makes that requires comment relates to the evidence linking him to the Brotsis checks. Those checks played no part in Pira's sentence, because the district court excluded them from its final calculation. Otherwise, Pira attacks some evidence on hearsay grounds, and other evidence as unworthy of belief. Even if it mattered at sentencing that something

was technically hearsay (and it does not—the evidence need only be reliable, *United States v. Omole*, 523 F.3d 691, 701-02 (7th Cir. 2008)), many of the statements that Pira labels as hearsay, such as Pira's own admissions and the personal observations of Special Agent Bush, are not in fact hearsay. Pira has said nothing about Costinos's credibility that overcomes the high level of deference we afford to the district court's finding. See *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001). We thus affirm the district court's relevant conduct determination and move to Pira's other arguments.

## III

Pira next contends that his sentence should not have been enhanced by four levels under USSG § 3B1.1(a), on the assumption that he was a leader or organizer of the offense. But the district court did no such thing. Instead, it concluded that Pira's conduct justified a two-level enhancement, under § 3B1.1(c), for being a "manager or supervisor," explaining that

> [w]ith respect to adjustment for role in the offense, I have a doubt as to whether or not Mr. Pira was really a—the organizer or leader of this. In many situations I think he was—he may well have been the smartest person, but I would characterize him more as a manager or supervisor. So instead of a four-level adjustment for role in the scheme under 3B1.1(a), I am going to give him a two-level enhancement.

Application Note 4 to § 3B1.1 lists seven factors that courts "should consider" when determining whether this adjustment is warranted. These include:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

§ 3B1.1 n.4; *United States v. Billingsley*, 115 F.3d 458, 464 (7th Cir. 1997). Additionally, this court has held that "an upward adjustment under section 3B1.1(c) does not require an explicit finding that the defendant exercised control, so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role." *United States v. Carrera*, 259 F.3d 818, 827 (7th Cir. 2001) (internal quotation marks omitted).

In this case, the evidence recounted in the PSR and produced at the sentencing hearing amply supports the district court's conclusion that Pira acted in a supervisory or managerial role. Though Pira urges that he was an "equal participant" in the offenses, the record belies that assertion. Pira regularly used "runners," such as Costinos, to assist him in his counterfeiting scheme. Costinos testified that he worked for Pira for 12 years, helping him by taking directions and fulfilling requests such as making purchases with stolen or fraudulent credit cards (which Pira provided for him) and opening bank accounts in a false name with a fake driver's license (which Pira helped him establish and obtain). Pira also used other runners and assistants.

Like a finding of relevant conduct, a determination by the district court that a defendant played a supervisory role is something that we review only for clear error.

*Billingsley*, 115 F.3d at 464. Pira's argument, as we mentioned earlier, misses the mark in any event, since he mistakenly thought that the district court accepted the Government's suggestion of a four-level enhancement. The district court agreed with him, finding that the evidence did not show that his role was that of a leader or organizer, and therefore it applied the lower enhancement for a "manager or supervisor" role. That finding was not clearly erroneous.

## IV

Pira's final challenge to his sentence concerns the district court's application of the factors outlined in 18 U.S.C. § 3553(a). First, Pira argues that the district court placed too much weight on the sentencing range recommended by the Guidelines; he accuses the court of taking the Guidelines sentence "as a starting point" rather than viewing it as "only one of five factors to be considered in determining the sentence." Our review of the record satisfies us that the district court made no such error. As it was required to do, it first consulted the Guidelines, and then it considered that range along with the other factors set forth in § 3553(a) before it settled on Pira's final sentence. See *United States v. Booker*, 543 U.S. 220, 259-60 (2005); *United States v. Tyra*, 454 F.3d 686, 687-88 (7th Cir. 2006). At the start of the sentencing hearing, the district court acknowledged that it was not bound by the Guidelines, noting that "the Guidelines are guidelines right now, so there is some flexibility." After providing all parties with an opportunity to discuss the way in which § 3553(a) ought to affect the sentence, the court again recognized its ability to deviate from the Guidelines if it thought doing so was warranted. Nothing suggests that it misunderstood the scope of its authority.

Next, Pira urges us to find that the district court imposed a sentence that was "greater than necessary" to achieve the goals of § 3553(a). This amounts to an attack on the reasonableness of the district court's sentence. He has not, however, presented any reason why we should override the district court's conclusion that this was a reasonable sentence. See *Rita v. United States*, 127 S.Ct. 2456, 2462 (2007) (holding that an appellate court "may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines"); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) (adopting such a presumption). Pira's cursory argument on this point falls far short of meeting his burden of rebutting the presumption of reasonableness that this court uses.

Finally, Pira argues that the district court "failed to consider several important circumstances of this case" when it fashioned its sentence. Among these considerations are Pira's prior cooperation with the Government as an informant for the Secret Service, Pira's status as a "devoted family man," the possibility that Pira (an Iraqi national) will face deportation as a result of this sentence, and the disparity between the intended losses and the actual losses that factored into his sentence. A look at the sentencing transcript, however, shows that the district court not only considered but also expressly addressed each of these factors.

Pira himself said little about his family (and even then did so only because the district court had prompted him), and so the district court cannot be faulted for failing to give greater weight to that point. Pira made more of his prior cooperation with the Secret Service, and the district court accordingly addressed this argu-

ment explicitly. During its final explanation of the sentencing order, the court said that its decision to reduce the amount of intended loss below the number it had initially reached resulted in part from "the difficulty in sorting out exactly what your [Pira's] role is because you were actually working with [the] Government agents on some of these—these matters." Thus, the record reflects both that the district court considered Pira's prior cooperation with the Secret Service and that it lowered its calculation of intended loss on account of that cooperation. The court also expressly took into account the disparity between the actual and intended loss, reducing its finding of intended loss by nearly $200,000 as a result. Finally, although the court may not have given the likelihood of Pira's eventual removal from the country the weight that Pira would have preferred, it discussed that point at length and gave it the weight it thought appropriate.

## V

All told, Pira's sentence is shorter than the one the district court initially considered and well below that which the Government requested, the PSR recommended, and the statute allows. We find no error, let alone clear error, in the district court's findings, and we further conclude that Pira has not demonstrated any unreasonableness in the district court's choice of sentence. We therefore AFFIRM the judgment of the district court.