In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2468

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DICK L. NOEL,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 CR 017—**John Daniel Tinder**, *Judge.*

ARGUED APRIL 8, 2009—DECIDED SEPTEMBER 4, 2009

Before EASTERBROOK, *Chief Judge*, and KANNE and
WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. Dick Noel was charged with
producing and possessing child pornography in viola-
tion of 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B). A jury
found Noel guilty on all counts, and on June 1, 2007, the
district court sentenced Noel to eighty years' imprison-
ment to be followed by a lifetime of supervised release.
Noel now appeals his conviction, arguing that (1) the

district court erred in allowing Indiana State Police Detective Jennifer Barnes to testify that certain images in evidence met the federal definition of child pornography, and (2) the court's jury instruction regarding the definition of a "lascivious exhibition of the genitals," which was derived from *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), was confusing to the jury. Noel also claims that his sentence was unreasonable and that the district judge failed to personally address him and offer him the opportunity to allocute. Although we find the government's approach in submitting certain evidence at trial troubling, none of the errors below require reversal of Noel's conviction or sentence.

## I. BACKGROUND

This case represents every parent's worst nightmare. Russell Beauchamp and his wife, Lori Beedi, consciously decided to restrict the care of their young son, "H," only to family members. In keeping with that decision, Beauchamp trusted his step-brother Dick Noel to care for H periodically from the time H was two years old. Noel often supervised H overnight, including every Friday. As the years progressed, Beauchamp and Beedi divorced, and Noel's role in H's life increased. For example, Noel would often care for H when Beauchamp was working late, and he provided assistance as H healed from a broken arm suffered in July 2005.

But a police investigation later revealed that Noel was not worthy of the trust that Beauchamp had bestowed. On July 31, 2005, Detective Brian Broughton of the Martin

County, Florida, Sheriff's Department began investigating Philip Vanderhoff for crimes against children. A search of Vanderhoff's computer revealed logs from chat sessions with a person with the screen name of "dick_noel2003." In those conversations, "dick_noel2003" referred to a "BL," meaning "boy lover," and certain "pics." He also described his relationship with a boy named H; this conversation included a description of various sexual encounters.[1]

The screen name was registered to a Dick Noel in Middletown, Indiana, whose personal information matched that of the appellant. Broughton referred this information to the Indiana Internet Crimes Against Children Task Force. Authorities searched Noel's house in August 2005, and seized several pieces of computer media. The hard drive of Noel's computer and several computer disks contained photographs organized into many folders, including one labeled "H," which held photos that portrayed H nude and asleep. The computer media also contained numerous photos of other minors engaged in sexually explicit conduct.

A grand jury returned a four-count indictment against Noel on January 25, 2006. Counts one through three charged Noel with production of child pornography in violation of 18 U.S.C. § 2251(a). These three counts were

---

[1] These conversations were not published to the jury but were referred to in the Presentence Investigation Report (PSR). Because they are not essential to our analysis, we will spare the reader the despicable details.

based on ten allegedly pornographic photos of H that investigators had found during the search of Noel's home. Count four charged Noel with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). This count was based not only on the ten pornographic photos of H, but also on numerous photos of other minors. A jury trial commenced on March 12, 2007.

As one of its primary witnesses, the government called Jennifer Barnes, a detective with the Indiana State Police who had conducted the forensic examination on the computer media seized from Noel's residence. Barnes explained that she found numerous images that met the federal definition of child pornography organized in multiple folders on Noel's computer system. She then described the government's exhibits, explaining how she compiled them and how they related to each of the charged counts.

Barnes testified that the government's Exhibit Nine contained all 246 images of H that were found on Noel's computer. These included not only the ten charged photos, but also numerous photos that were not pornographic, such as clothed photos of H in outdoor settings. These photos were all admitted into evidence without objection.

Exhibits One, Two, and Three contained the photos that formed the basis for counts one through three against Noel, respectively. Barnes told the jury that these were duplicates of certain photos that were also contained in Exhibit Nine. The prosecution asked Barnes: "And these were, in your opinion, although the jury will

be making that determination, pictures that fit within federal law?" Barnes responded affirmatively.

Barnes stated that the government's Exhibit Four contained the photos on Noel's computer that met the federal definition of child pornography. She described the folders on Noel's computer from which the photos came and informed the jury that those folders also contained photos of child pornography that were not present in the exhibits. She later explained to the jury that Exhibit Four contained all photos relevant to count four, the possession charge, including copies of the photos of H in Exhibits One through Three. All in all, Barnes opined at least six times during her testimony that the charged photos were pornographic.

At the close of evidence, the court instructed the jury regarding the definition of "lascivious exhibition of the genitals" in the context of child pornography, using the factors articulated in *Dost*, 636 F. Supp. at 832. During the government's closing argument, the prosecution described some of the photos and argued, using the *Dost* factors, that they each fell within the definition of child pornography. Defense counsel chose not to focus on the photos, telling the jury:

> I'm going to give you some good news. You are not going to have to look at those pictures again in order to make up your minds about this case, because people, reasonable people, could probably decide that those are minors and that that's pornography. Probably could, and I'm not going to argue that. That's not our issue.

Instead, defense counsel, after acknowledging that the photos were "horrible," argued that there was not enough evidence to find that Noel had produced or knowingly possessed them. She then reiterated: "You don't need to look at these pictures again. I mean, you certainly can if you want to, but from our perspective, you don't need to."

Defense counsel also criticized the police investigation, claiming that the detectives failed to inquire into who owned and created the pornography. As a part of this claim, counsel stated: "Where they were looking for pornography, they found pornography and they were done."

The jury returned a guilty verdict on all counts. The district court held a sentencing hearing on June 1, 2007. At the outset of that hearing, the judge stated:

> And I'll now hear first from the government with respect to its argument regarding sentencing, and then I'll hear from the defense. And of course, Ms. Jensen, as part of the defense presentation, your client, Mr. Noel, has the right to speak; that is, to say whatever he wants to say to help me in determining what the sentence should be.

After the government's presentation, the district court asked defense counsel, "Miss Jensen, do you have a presentation you'd like to make regarding sentencing and would your client like to address me?"

Defense counsel began by reading a letter that Noel had prepared. She explained that Noel had provided her

with the letter too late for the probation officer to in-clude it in the PSR, but she nonetheless felt it might be appropriate to share with the court.

In the letter, Noel never admitted to his conduct. The letter stated that Noel was not aware of the material on his computer and described how his trust had been betrayed by an unnamed friend.[2] Noel wrote: "He had my computer, as my mentor, set up the passwords, he even chatted under my chat name. He had the run of the house three to four days a week." Noel explained that other minors and Beauchamp himself had stayed at his house and that "[t]hey also witnessed that nothing ques-tionable ever happened."

Nonetheless, Noel apologized in the letter, stating, "I do want to apologize for all the pain this has caused. I grieve for all of my family who felt this trust was be-trayed by me. I feel their pain very deeply." He ex-plained that words failed to express his "deep love" for H, and he said that "when I think that our wonderful rela-tionship has now had the shadow cast on it, it causes my very soul to hurt. He alone, other than myself, knows the purity of our ten-year relationship." The letter con-cluded by requesting a merciful sentence.

After defense counsel's presentation, the district court considered the letter but ultimately concluded that an

---

[2] Although Noel did not name this friend in the letter, defense counsel argued during closing arguments that a man who regularly fixed Noel's computer was responsible for the photo-graphs.

acceptance of responsibility adjustment was inappropri-ate.[3] The district court determined that the letter was inconsistent with statements Noel made to law enforce-ment and was "a denial of the very things that would constitute acceptance of responsibility."

The district court applied a base offense level of 48, with a criminal history level of I. This resulted in a recom-mended guidelines sentence of the statutory maxi-mum—one hundred years' imprisonment.[4] After con-sidering the sentencing factors enumerated in 18 U.S.C. § 3553(a), the district court imposed a below-guidelines sentence of eighty years' imprisonment—twenty-five years for each of counts one through three, and five years for count four, to be served consecutively.

## II. ANALYSIS

Noel challenges his conviction on appeal, claiming that the district court erred in allowing certain aspects of Barnes's testimony and in instructing the jury based on

---

[3] An acceptance of responsibility adjustment would have resulted in a two-point decrease in the total offense level. *See* U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3E1.1. Because Noel was five levels above the highest offense level, this would not have had an impact on his guidelines sentence.

[4] The guidelines range for offense levels 43 and higher is life in prison. Where, as here, the guidelines range exceeds the statutory maximum, the statutory maximum becomes the guidelines sentence. U.S.S.G. § 5G1.1(a).

the *Dost* factors. He also appeals his sentence as unreasonable and argues that he was not given the opportunity to allocute. We discuss each issue in turn.

## A.  Noel's Challenges to His Conviction

Noel claims that Detective Barnes rendered an impermissible legal conclusion that the government's exhibits met the federal definition of child pornography. He also argues that this error was exacerbated by the district court's purportedly "muddled and confusing" jury instruction defining "lascivious exhibition of the genitals" using the factors described in *Dost*, 636 F. Supp. at 832. We find error in Barnes's testimony but not the jury instructions. Because the error did not affect Noel's substantial rights, however, his conviction will be affirmed.

### 1.  Testimony of Detective Barnes

At Noel's trial, Barnes testified repeatedly that the images on Noel's computer met the federal definition of child pornography. She provided no explanation for this opinion, but instead offered only conclusory statements. We find the government's explanation for this testimony troubling and agree with Noel that it was improper.

Under the Federal Rules of Evidence, testimony is not objectionable solely "because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid.

704(a); *see also United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008). But this rule "does not lower the bars so as to admit all opinions." Fed. R. Evid. 704 advisory committee's note. The evidence must be otherwise admissible as lay testimony under Rule 701, *United States v. Baskes*, 649 F.2d 471, 478-79 (7th Cir. 1980), or expert testimony under Rule 702, *United States v. Scavo*, 593 F.2d 837, 844 (8th Cir. 1979). Most importantly for our purposes, the testimony must be helpful to the trier of fact under either rule. Fed. R. Evid. 704 advisory committee's note; *see also* Fed. R. Evid. 701(b), 702.

We have held repeatedly that lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by Rule 701(b). *See, e.g.*, *Wantuch*, 525 F.3d at 514 (holding that the question of whether the defendant knew his actions were legal "demanded a conclusion as to the legality of [the defendant's] conduct, which is unhelpful to the jury under Rule 701"); *United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994) ("[T]he question posed to Espino, '[Y]ou're admitting the conspiracy, aren't you,' required a conclusion regarding the legal implications of his conduct. Espino's lay answer to this question was therefore objectionable as being unhelpful opinion testimony and should have been excluded." (second alteration in original)). This is because a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004). Once the evidence is presented, the jury is capable of examining it and determining whether it supports a conviction; it

does not need lay testimony to assist in making that determination. *Cf. Wantuch*, 525 F.3d at 514 ("The jury was just as capable as [the witness] of inferring that Wantuch knew he was committing a crime, without [the witness opining] as to whether Wantuch was aware that his conduct was illegal.").

Barnes's testimony that the photos found in Noel's home met the federal definition of child pornography amounted to nothing more than a statement that the photos were illegal. Given proper instructions, the jury was capable of making this determination on its own. This testimony was unhelpful to the jury as lay testimony and inadmissible under Rule 701(b).

The government claims that this rule is irrelevant because Barnes was presented as an expert and her testimony was admissible under Rule 702. But even if Barnes was properly qualified as an expert,[5] her testimony does not pass muster under Rule 702 because it was no

---

[5] The record reveals that Barnes was offered in part as a fact witness to explain the course of the police investigation and in part as an expert witness. The breadth of her expertise is disputed, however. Noel claims that she was only offered as an expert in computer forensics. The government, on the other hand, claims that she was also an expert in child pornography, pointing to her extensive experience in these investigations and her testimony that she was familiar with the federal and Indiana definitions of child pornography. We need not resolve this conflict because of our finding that, in any event, Barnes's testimony was unhelpful to the jury.

more helpful as expert testimony than it would have been as lay testimony.

In her testimony, Barnes gave no basis whatsoever for her conclusion that the images on Noel's computer were child pornography under the federal definition. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989). We have therefore described an expert's opinion that lacks proper substantiation as "worthless." *Minasian v. Standard Chartered Bank*, 109 F.3d 1212, 1216 (7th Cir. 1997). Thus, even though expert witnesses may opine on ultimate issues of the case, under Rule 702 their opinions may not be divorced from the expert bases that qualified them as witnesses in the first place. *United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996).

Barnes's "expert" testimony that the photos met the definition of child pornography was a bare conclusion that provided nothing but the bottom line, i.e., that Noel possessed illegal photos. Had Barnes provided some basis for this explanation, perhaps her testimony would have been of some use for the jury.[6] But she did not do so. She, in essence, told the jury nothing more than,

---

[6] Noel cites *United States v. Thoma*, 726 F.2d 1191 (7th Cir. 1984), for the proposition that whether photos are child pornography is an inappropriate topic for expert testimony altogether. We need not reach this issue, and we express no opinion regarding whether Barnes's testimony would have been objectionable if otherwise properly substantiated.

"I am familiar with the definition of child pornography, and this meets that definition because I said so." Regardless of whether Barnes was an expert, she could not "merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee's note; *see also United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005).

At oral argument, the government's only justification for this testimony was that it wanted to inform the jury that the *government* knew the difference between the illegal and legal photos. According to the prosecutor, in addition to the ten photos for which Noel was charged in counts one through three, the remaining 236 photos of H presented to the jury were legal and did *not* meet the definition of child pornography. Counsel explained that these photos were offered to show how much Noel loved H and to provide a motive for the crime. She surmised that juries often do not understand why certain photos are not illegal; as a result, the government was attempting to show that it knew the difference between legal and illegal and that it was not attempting to convict Noel based on the legal photos.[7]

But even if we accept the government's rationale, Barnes's testimony did nothing to help the jury under-

---

[7] This begs the question of why the legal photos were presented to the jury in the first place. Noel has not appealed this issue, so we need not decide whether the admission of this evidence was proper, but we see no reason why the government could not have simply presented the ten illegal photos to establish Noel's motive.

stand *why* certain photos were illegal. With such damning evidence against Noel, the government would have been well served to simply stick to the facts: present the charged photos to the jury and allow it to reach its own conclusions based on the court's instructions. Prosecutors were certainly free to argue that the photos were pornographic, but the proper forum was in the opening or closing arguments, not during the presentation of evidence. *Cf. Garcia*, 413 F.3d at 214 (explaining that the opening statement is the proper vehicle for the government to help the jury gain an overview of the evidence and theories of the case).

Moreover, to the extent that the government felt compelled to explain its subjective motivations or the thought processes of its investigators, these considerations are irrelevant to Noel's guilt or innocence. Indeed, the government's focus on the investigators' subjective views to justify this line of questioning is troubling. In *United States v. Cunningham*, we held that detailed questioning regarding the procedures used to obtain court authorization for wiretaps was inadmissible because it was irrelevant to the defendants' guilt or innocence. 462 F.3d 708, 712 (7th Cir. 2006). Instead, we opined that the explanation of why the government did what it did was simply a back-door way to show that numerous government agents believed the defendants were committing crimes, which was impermissible. *Id.* at 713.

Although the facts in this case are different from those in *Cunningham*, we suspect that the government's motivation was similar. The only plausible reason the govern-

ment would want to show that its investigators believed the photos were illegal was to persuade the jury to agree. But without a proper explanation to help the jury form that conclusion on its own, this type of testimony is not allowed.

That Barnes's testimony was improper is not dispositive of this case, however. Because Noel did not object to Barnes's comments at trial,[8] our review is for plain error, "and we will reverse only if the errors resulted in an actual miscarriage of justice such that the defendant probably would have been acquitted but for the erroneously admitted evidence." *United States v. Avila*, 557 F.3d 809, 819-20 (7th Cir. 2009) (quotations omitted). We are convinced that Noel would have been convicted even if Barnes had not been allowed to testify improperly, and, therefore, reversal is not warranted.

Fortunately, we are able to spare the reader the photos' stomach-turning details to reach our conclusion, because we need not go beyond defense counsel's words at Noel's trial to determine that the result would have been the same without Barnes's testimony. During her closing argument, defense counsel explicitly told the jury twice that there was no need to review the photos in making its determination. She said that whether the photos were pornographic was "not our issue" and instead argued that the government had

---

[8] The only objections were to any description of the photos. Defense counsel argued the photos spoke for themselves, and the district court agreed.

failed to prove that it was Noel who had produced the photos. She even commented that "[w]here [the government was] looking for pornography, they found pornography."

Given the focus of Noel's closing argument and the concessions by his counsel, he cannot now argue that he was prejudiced by Barnes's comments. Not only did his attorney concede that the photos were pornographic, but she did so in what was likely a deliberate trial strategy to shift the jury's attention away from their content. Noel's sole focus at trial was knowledge, i.e., he claimed that someone else had produced the photos and that he did not know they were on his computer. Barnes's improper opinion that the photos were pornographic therefore did not result in a manifest miscarriage of justice such that reversal is warranted.

### 2.  The Dost Jury Instruction

Noel claims that the harm resulting from Barnes's improper testimony was exacerbated by a confusing jury instruction defining child pornography. The district court provided the jury with the following instruction based on the language in *Dost*, 636 F. Supp. at 832:

> In determining whether a visual depiction is a "lascivious exhibition of the genitals or pubic area of any person," there are a number of factors for you to consider. Those factors include but are not limited to:
>
> > (1) whether the focal point of the picture is the minor's genitalia or pubic area;

(2) whether the visual setting or pose is sexually suggestive, that is, in a place or a pose generally associated with sexual activity;

(3) whether the minor's pose is unnatural or whether the minor is dressed in inappropriate attire given his/her age;

(4) whether the minor is partially or fully . . . nude;

(5) whether sexual coyness or willingness to engage in sexual activity is suggested; and

(6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

The government is not required to prove each of these factors is present for a visual depiction [to] be a "lascivious exhibition of the genitals or pubic area." The determination will have to be made based on the overall content of the visual depiction, taking into account the age of the minor.

Noel claims that this instruction was "confusing and muddled." He argues that "lascivious" is a "commonsensical term [that] needs no adornment."

We typically review jury instructions *de novo*, but give the district court substantial discretion to formulate the instructions "so long as [they] represent[] a complete and correct statement of the law." *United States v.*

*Matthews*, 505 F.3d 698, 704 (7th Cir. 2007). Our review in this case is more deferential, however. Noel did not object to this jury instruction at trial, so we review for plain error, *United States v. Jackson*, 479 F.3d 485, 491 (7th Cir. 2007), a standard that is particularly limited in the context of jury instructions, *United States v. Peters*, 435 F.3d 746, 754 (7th Cir. 2006). To warrant reversal, " '[t]he error [must] be of such a great magnitude that it probably changed the outcome of the trial.' " *Id.* (second alteration in original) (quoting *United States v. Moore*, 115 F.3d 1348, 1362 (7th Cir. 1997)). As we have noted, where there is no objection at trial, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction." *Id.* (quotations omitted).

There has been some debate among courts regarding the propriety of jury instructions based on the *Dost* factors. *Compare United States v. Rivera*, 546 F.3d 245, 250-53 (2d Cir. 2008) (holding that the *Dost* factors, although imperfect, are an accurate statement of the law and that jurors "need neutral references and considerations" when interpreting the word "lascivious"), *and United States v. Villard*, 885 F.2d 117, 122 (3d Cir. 1989) ("[T]he *Dost* factors provide specific, sensible meaning to the term 'lascivious,' a term which is less than crystal clear."), *with United States. v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) (noting that the *Dost* factors have resulted in "disputes that have led courts far afield from the statutory language" and that "the *Dost* test has produced a profoundly incoherent body of case law" (quotations omitted)), *and United States v. Hill*, 332 F. Supp. 2d 1081, 1085

(C.D. Cal. 2004) ("While the *Dost* factors attempt to bring order and predictability to the lasciviousness inquiry, they are highly malleable and subjective in their application."). Much of the debate over *Dost* involves a concern that is of no help to Noel—that the factors listed may be *too generous* to the defendant. *Rivera*, 546 F.3d at 251; *see also, e.g.*, *Frabizio*, 459 F.3d at 88 ("[T]here is a risk that the *Dost* factors will be used to inappropriately *limit* the scope of the statutory definition."); *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987). Still other commentary has suggested, however, that in certain cases, some *Dost* factors may be over-inclusive. *See, e.g.*, *Rivera*, 546 F.3d at 252 ("[I]f the sixth factor were to focus on the defendant's subjective reaction to the photograph, as opposed to the photograph's intended effect, a sexual deviant's quirks could turn a Sears catalog into pornography." (quotations omitted)).

We have not yet taken a position on whether the *Dost* factors represent a permissible instruction, and we need not do so today. Even if improper, the instruction does not rise to the level of plain error because it was unlikely to have influenced the jury's verdict. As described above, defense counsel admitted that the outcome of the case did not turn on the issue of whether the photos were pornographic; it turned on Noel's knowledge. Noel conceded that the photos were pornographic and told the jury it did not need to look at them. For the same reason that Barnes's improper testimony does not merit reversal, nor does the *Dost* instruction: the outcome of the trial would not have been different without it.

*B. Noel's Challenges to his Sentence*

Noel also challenges his sentence, claiming that (1) it was excessive and unreasonable; and (2) the district court erred in failing to personally address him and give him the opportunity to allocute.

*1. Reasonableness*

We can quickly dismiss Noel's argument that his sentence was unreasonable. A sentence that falls within a properly calculated guidelines range is presumptively reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Not only is Noel's sentence presumptively reasonable under that rule, but it was actually twenty years *below* the guidelines sentence of one hundred years' imprisonment. In order to rebut the presumption of reasonableness, Noel must demonstrate that this below-guidelines sentence was unreasonable in light of the factors set forth in § 3553(a). *See id.* He has failed to do so.

First, Noel claims that the most appropriate sentence is a structured treatment program including psychotherapy and medications. He claims that the imposed prison sentence does not meet his needs and notes that an eighty-year sentence amounts to life in prison for a man of his age. But the district court considered these arguments in its § 3553(a) analysis, and none of them are sufficient to override its well-reasoned sentence. Noel's acts were unspeakable. He betrayed Beauchamp's trust by producing pornography while caring for Beauchamp's young son. He amassed a tremendous amount of child

pornography throughout his life. Considering these troubling facts, we find no error in the district court's determination that Noel's conduct warranted a lengthy prison sentence.

Noel also argues that his sentence was unreasonably disproportionate to that of other defendants convicted of the same offense, but we find this argument unconvincing. We have held that "[w]hile comparisons are appropriate, . . . [i]t is not enough for a defendant to argue that a few cases . . . seem to cast doubt on his sentence." *United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005). Instead, "we have a system of individualized sentencing [that] takes into account factors other than the type of crime." *United States v. Cavender*, 228 F.3d 792, 803 (7th Cir. 2000). Furthermore, the statutory penalties and guidelines sentences for producing child pornography have recently increased.[9] *Compare* 18 U.S.C. § 2251(e) (2007)

---

[9] In his reply brief, Noel objects to the government's reliance on this change because he claims he was sentenced to almost three times the statutory maximum. He correctly notes that the statutory maximum for production of child pornography is thirty years, while he was sentenced to eighty. But the statutory maximum is thirty years *for each count*. Noel was convicted of three counts of producing child pornography and was sentenced to twenty-five years per count. He was also convicted of possessing child pornography and sentenced to five years for that charge. His sentence is therefore almost three times the statutory maximum for producing child pornography because he was convicted of three counts of that offense. Noel

(continued...)

(imposing a maximum sentence of thirty years in prison for production of child pornography), *and* U.S.S.G § 2G2.1(a) (2007) (imposing a base offense level of thirty-two for violations of 18 U.S.C. § 2251), *with* 18 U.S.C. § 2251(d) (2002) (imposing a maximum sentence of twenty years in prison for production of child pornography), *and* U.S.S.G § 2G2.1(a) (2002) (imposing a base offense level of twenty-seven for violations of 18 U.S.C. § 2251). Sentencing statistics that include defendants sentenced prior to these changes therefore have little probative value. With all these considerations in mind, we conclude that Noel's sentence was reasonable.

### 2. Allocution

We next turn to Noel's argument that the district court erred in denying him the right to a meaningful allocution. Because Noel did not object at sentencing, our review is again for plain error. *United States v. Luepke*, 495 F.3d 443, 446 (7th Cir. 2007). To prevail, Noel must demonstrate that a plain error occurred that affected his substantial rights. *Id.* at 448. If he makes this showing, "we may reverse, in an exercise of discretion, if we determine that the error seriously affect[ed] the fairness, integrity, or

---

[9] (...continued)

does not argue that consecutive sentences were inappropriate. If anything, this detracts from his argument that his sentence was disproportionate because the statistics upon which he relies likely include defendants serving sentences for a single offense.

public reputation of the judicial proceedings." *Id.* (quotations omitted).

### a. Whether Plain Error Occurred

In *Green v. United States*, 365 U.S. 301, 304 (1961), the Supreme Court rejected the view that inviting defense counsel to speak at sentencing satisfied the defendant's right to address the court and allocute. Instead, the Court held that before imposing a sentence, a trial judge must address the defendant *personally* and offer him the opportunity to speak. *Id.* This holding was later codified in Federal Rule of Criminal Procedure 32(i)(4)(A)(ii). *See United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991).[10]

At the outset of Noel's sentencing, the district judge addressed Noel's counsel and stated, "[Y]our client, Mr. Noel, has the right to speak." After the government made its presentation, the court asked defense counsel, "Miss Jensen, do you have a presentation you'd like to make regarding sentencing and would your client like to address me?" Noel's counsel responded by reading

---

[10] As *Barnes* recognized, the holding in *Green* was originally codified at Rule 32(a)(1). *See* Fed. R. Crim. P. 32 advisory committee's note (1966 Amendments). Although the Rule has subsequently been reorganized, its application for our purposes remains unchanged. *See* Fed. R. Crim. P. 32 advisory committee's note (2002 Amendments) (stating that, unless otherwise noted, changes were intended to be stylistic only).

aloud a letter that Noel had addressed to the court. The government claims that this was a sufficient opportunity to allocute under Rule 32. We cannot agree. The record is clear that the district court addressed defense counsel and asked "would your client like to address me?" but the court did not directly address the defendant himself. This is contrary to the language of Rule 32 and constitutes plain error.

In arguing that the district court's comments satisfied Rule 32, the government relies on *United States v. Williams*, 258 F.3d 669 (7th Cir. 2001), and *United States v. Franklin*, 902 F.2d 501 (7th Cir. 1990). However, neither case is supportive. In *Williams*, the district court said at sentencing, "Mr. Williams, is there anything that you would like to say?" 258 F.3d at 674. We held that this satisfied Rule 32's requirement that the court address the defendant personally because "it [was] clear that the court addressed Williams himself, *not his lawyer or any other representative*." *Id.* at 674-75 (emphasis added). Similarly, in *Franklin*, the district judge asked *both* defense counsel and the defendant if either or both of them had a statement they wished to make. 902 F.2d at 507. We held that this was sufficient because the record indicated that the district court judge explicitly addressed the defendant. *Id.*

Unlike in *Williams* and *Franklin*, the record in this case makes clear that the district court was addressing Noel's counsel only. He began each statement by referring to "Miss Jensen," and then advised what *her client* had the right to do. In all of these addresses, the court

referred to Noel only in the third person. In response to the district court, Jensen made her presentation (which was constructed much as an allocution), but the district court never returned to Noel to ask him directly whether he would like to speak. Although the mistake is understandable given the reading of Noel's letter, this is not the type of personal address the rule unequivocally requires.

The Supreme Court's own language in *Green* is instructive: "Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." 365 U.S. at 305. Such a "personal invitation" was lacking here, an omission that constituted plain error.

*b. Whether the Error Affected Noel's Substantial Rights*

We now turn to the question of whether this plain error affected Noel's substantial rights. In the ordinary case, the defendant's burden of showing that an error affected his substantial rights requires a demonstration of prejudice. *Luepke*, 495 F.3d at 450-51. But when, as here, the error violated the right to allocute, we "presume prejudice when there is any possibility that the defendant would have received a lesser sentence had the district court heard from him before imposing sentence." *Id.* at 451.

In *Luepke*, we emphasized the discretionary nature of sentencing when explaining the reasoning behind this

presumption. *Id.* We noted that "[i]n a post-*Booker* world . . . [i]t would be almost impossible to determine whether, in the context of the advisory guidelines and the court's balancing of the statutory sentencing factors, a defendant's statement, that was never made, would have altered the conclusions of the sentencing court." *Id.* Thus, when determining whether Noel's substantial rights were affected, we do not speculate as to what he may have said, nor do we try to determine whether it would have been persuasive. *See United States v. O'Hallaren*, 505 F.3d 633, 636 (7th Cir. 2007) ("[W]e cannot speculate as to the persuasive ability of anything O'Hallaren may have said in his statement to the court."); *Luepke*, 495 F.3d at 451 (explaining that a presumption of prejudice "avoids our speculation about what the defendant might have said had the right been properly afforded him").

With these considerations in mind, we cannot conclude that Noel would have received the same sentence had he been afforded the opportunity to allocute. Although Noel has not submitted that he would have said anything different than what he wrote in his letter, allowing counsel to speak in Noel's stead does not cure the prejudice stemming from the violation of his rights. *See Green*, 365 U.S. at 304. As the Supreme Court has suggested, "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Id*. In other words, it is not only the content of the defendant's words that can influence a court, but also the way he says them. Noel has therefore established that the court's failure to address

him personally was plain error that affected his substantial rights.

### c.   *The Fairness, Integrity, and Public Reputation of Judicial Proceedings*

That Noel has established plain error does not end our inquiry, for our decision of whether to correct that error is discretionary. We exercise that discretion and remand only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Luepke*, 495 F.3d at 451.

Although we have ordinarily remanded in circumstances where a defendant has been denied the right to allocute, *United States v. Pitre*, 504 F.3d 657, 663 (7th Cir. 2007), the Supreme Court has stated that an error such as this "is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure," *Hill v. United States*, 368 U.S. 424, 428 (1962). "Thus, the general rule does not foreclose the possibility that the facts of a particular case may compel a conclusion that any violation of the defendant's right to allocut[e] did not affect seriously the fairness of the judicial proceedings." *Pitre*, 504 F.3d at 663.

This case compels such a conclusion. Although the district judge did not address the defendant personally, he mentioned Noel's right to allocute *twice* in open court. Moreover, this is the only case we have encountered where the defendant's own words were read aloud at

a sentencing hearing. Noel's letter was structured much as an allocution would have been, and *everyone* at the hearing overlooked that he had not personally been afforded the opportunity to speak. The error was therefore understandable, and it is difficult to fault the district judge for not recognizing that a proper allocution had not occurred. Furthermore, Noel's sentence was twenty years *below* the applicable guidelines sentence, which is presumptively reasonable and perhaps even low given the egregious nature of Noel's conduct. Under the facts of this case, we conclude that the district court's error "did not implicate [the] core values in our sentencing process," and that the equity of that process, both perceived and applied, remains intact. *Luepke*, 495 F.3d at 452; *see also id.* at 451 (noting the value of allocution in the perceived equity of the sentencing process). We therefore decline to exercise our discretion to remand for resentencing, and Noel's sentence will be affirmed.

## III. CONCLUSION

In cases involving such reprehensible conduct, the government's tenacity in pursuing a conviction is understandable. But cases such as these require even more caution to ensure that the fairness of the judicial proceedings remains intact so that the resulting convictions and sentences are sound. It is up to the government to present the facts and allow the jury to do its job, without resorting to testimony that usurps the jury's function. Although Barnes's testimony was improper, we are

convinced that the outcome would have been the same had it been excluded. We therefore AFFIRM Noel's conviction. We also find that although the district court committed plain error during Noel's sentencing, that error did not affect the fairness, integrity, or public reputation of the judicial proceedings, and we AFFIRM Noel's sentence.

EASTERBROOK, *Chief Judge*, concurring.   Although the court holds that the district judge committed plain error by failing to "address the defendant personally" about allocution, as Fed. R. Crim. P. 32(i)(4)(A)(ii) requires, it also declines to reverse, because it is very unlikely that the gaffe affected the outcome. The judge twice invited allocution (though when speaking to counsel rather than Noel), and in response counsel read aloud a letter that Noel had written to the judge. Noel evidently thought that something composed in advance would present his position better than extemporaneous oral remarks. He has never contended that he did not know of his right to speak on his own behalf, and he has never asserted that he would have spoken if only the judge had raised the subject with him rather than counsel. Even the plainest of errors justifies reversal only if allowing the decision to stand would impair "the fairness, integrity or public reputation of judicial proceedings" (*United States*

*v. Atkinson*, 297 U.S. 157, 160 (1936), quoted in *United States v. Olano*, 507 U.S. 725, 736 (1993)). The integrity and public reputation of judicial proceedings would be undermined, rather than reinforced, if this court reversed on account of the district judge's inconsequential misstep.

I write separately to question the conclusion of *United States v. Luepke*, 495 F.3d 443, 451 (7th Cir. 2007), that, when conducting plain-error review of a contention that the district judge violated Rule 32(i)(4)(A)(ii), the court of appeals must "presume prejudice when there is any possibility that the defendant would have received a lesser sentence had the district court heard from him before imposing sentence." There are two problems with this standard: first the presumption in defendant's favor, and second the proposition that "any possibility" of prejudice suffices to establish plain error.

Even on harmless-error review, the burden of showing prejudice rests on the defendant, not the prosecutor. See *Kotteakos v. United States*, 328 U.S. 750 (1946); cf. *O'Neal v. McAninch*, 513 U.S. 432 (1995). It is supposed to be harder to show plain error (when the defendant forfeited the issue by failing to raise it in the district court) than to show harmless error (when the defendant did raise the issue, and the judge wrongly rejected the argument). Yet *Luepke* makes it easier to reverse on plain-error review than on harmless-error review.

Only grave and prejudicial errors justify reversal when the defendant did not alert the district judge to the problem. See, e.g., *United States v. Young*, 470 U.S. 1 (1985);

*Atkinson*; *Olano*. During the last 20 years, courts of appeals have occasionally declared that one or another kind of error warrants a modified rule, in which prejudice is presumed—and sometimes in which reversal follows if there is "any possibility" that the defendant was adversely affected. The Supreme Court has disapproved that approach. For example, when a court of appeals declared that prejudice would be presumed if alternate jurors are present during deliberations, the Supreme Court reversed in *Olano* and held that the defendant bears the burden of establishing prejudice. When a court of appeals concluded that prejudice is presumed if a district court fails to provide the defendant with all of the information required by Fed. R. Crim. P. 11, the Supreme Court reversed and held that the defendant bears the burden of showing prejudice, *United States v. Vonn*, 535 U.S. 55 (2002), meaning that he would not have pleaded guilty had he received the information. *United States v. Dominguez Benitez*, 542 U.S. 74 (2004).

And when some courts of appeals concluded that a prosecutor's failure to keep a promise in a plea agreement leads to reversal unless the prosecutor shows that there is "no possibility" of an adverse effect, the Supreme Court replied that the defendant bears the burden of showing prejudice. *Puckett v. United States*, 129 S. Ct. 1423 (2009). See also *United States v. Marcus*, 538 F.3d 97, 102–05 (2d Cir. 2008) (Sotomayor, J., concurring) (questioning the second circuit's doctrine that prejudice is presumed for ex post facto issues, and that reversal is required if there is "any possibility" that pre-enactment conduct affected the verdict), petition for cert. filed, No. 08-1341.

Now it is true that *Olano* and its successors state that the defendant "ordinarily" bears the burden of establishing prejudice. This leaves open the possibility of presuming prejudice for some kinds of error. Yet it is also true that the Supreme Court has never found it appropriate to place the burden on the prosecutor when reviewing under Fed. R. Crim. P. 52(b). And the Justices have never so much as hinted that a "no possibility of harm" standard would be appropriate for *any* kind of error. A small category of "structural errors" justifies reversal without inquiry into prejudice—for example, the participation by a judge who does not hold office under Article III, see *Nguyen v. United States*, 539 U.S. 69 (2003), or deprivation of the right to counsel of one's choice, see *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)—but no one thinks that a violation of Rule 32(i)(4)(A)(ii) is in the structural-error category. When the standard of review is plain error, reversal is "difficult, 'as it should be.'" *Puckett*, 129 S. Ct. 1429, quoting from *Dominguez Benitez*, 542 U.S. at 83 n.9.

*Luepke* justified transferring the burden to the prosecutor, and adopting the "no possibility" standard, because it is hard to show an adverse effect from a judge's failure to address the defendant personally— rather than, say, addressing counsel in the defendant's presence, which conveys the same information but does not satisfy Rule 32(i)(4)(A)(ii). But the reason it is hard to show injury is that violations of the Rule usually are inconsequential. That a violation did not affect anyone's behavior—which may explain why no one objected—ought not make reversal the norm. It is instead why a court

of appeals should allow the judgment to stand. It cannot be sound to say that the more technical the violation, and the less likely any adverse consequence, the more readily a court of appeals must reverse. Everything *Luepke* said about violations of Rule 32(i)(4)(A)(ii) could have been said—and was said, by the ninth circuit—in *Vonn* and *Dominguez Benitez*. But the Supreme Court held that the defendant must show prejudice when the district judge fails to supply the information required by Rule 11. If, for example, the defendant knew (perhaps having been told by counsel) the information on the Rule 11 list, there is no point in taking the plea anew. Just so with a violation of Rule 32(i)(4)(A)(ii). *Luepke* should be overruled.

WILLIAMS, *Circuit Judge*, dissenting. I join my colleagues wholeheartedly in affirming Noel's conviction and agree that any errors that may have occurred during trial were harmless due to the overwhelming evidence of his egregious conduct. I write separately, however, because I disagree with the panel's conclusion that the denial of his right to allocute did not undermine the fairness of the judicial proceedings. Instead, I would remand for resentencing. In light of Chief Judge Easterbrook's concurrence, I also write to stress the importance of the presumption of prejudice afforded to a

defendant who has been denied the opportunity to allocute, and to reiterate why the standard adopted in *United States v. Luepke*, 495 F.3d 443 (7th Cir. 2007), should remain the law of this circuit.

## I.

In *Luepke*, we held that "in the vast majority of cases, the denial of the right to allocut[e] is the kind of error that undermines the fairness of the judicial process," based, in part, on the right's practical role and its effect on the "perceived equity of the [sentencing] process." *Luepke*, 495 F.3d at 451 (quoting *United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991). We also stated that "[a]bsent some rare indication from the face of the record that the denial of this right did not implicate these core values, resentencing is the appropriate judicial response." *Id.* at 452. In this case, the district judge mentioned Noel's right to allocute in open court (albeit to his lawyer); Noel's lawyer read aloud, during the sentencing hearing, a letter Noel had written previously; and the judge issued a sentence twenty years below the 100-year guideline sentence. For these reasons, the panel concludes that the error did not "implicate [the] core values in our sentencing process." Op. at 28. I find each of these points unpersuasive, and I am not convinced that they bring this case within the narrow category of cases that do not require resentencing.

The Supreme Court recognized, in *United States v. Green*, that Rule 32, as then written, contained an "inflexible requirement" that the district judge address the

defendant to allow him the opportunity to allocute. 365 U.S. 301, 303 (1961). And, as the panel notes, Rule 32(i)(4)(A)(ii) codified this holding by explicitly requiring the judge to *personally* offer the defendant the opportunity to allocute. This amendment clarified what the Supreme Court had intimated: that ambiguous references or invitations not directed to the defendant fail to protect the right to allocute, and, by extension, cast doubt over the fairness of the proceedings. *See Green*, 365 U.S. at 304; *see also id*. at 307-08 (Black, J., dissenting) ("[i]t would be wholly artificial to regard this opportunity as having been afforded in the absence of a specific and personal invitation to speak . . . [t]he very essence of the ancient common-law right . . . has always been the putting of the question to the defendant . . . ."); *United States v. Adams*, 252 F.3d 276 (3d Cir. 2001) (remanding for resentencing after district judge asked defense counsel if defendant wanted to exercise his right to allocute but did not ask defendant personally). Although, some may believe that "violations of the Rule usually are inconsequential," Conc. Op. at 32, an acknowledgment of the defendant's right to speak, posed to his lawyer, cannot be equated with a personal invitation to the defendant to address the court. Relying on the former would require the defendant to interject in an ongoing conversation between the lawyers and the judge that has taken place throughout the proceedings—an unrealistic expectation in an environment where the lawyer is assumed to speak for the client. Indeed, Rule 32 places an affirmative duty on the court to invite allocution, avoiding the need for defendants to attempt, on their own, to ask for an oppor-

tunity to speak. To now claim that "putting the question" to defense counsel somehow preserves the fairness of the proceedings is at odds with the purpose of the rule and the Court's pronouncement in *Green*.

Nor do I believe that Noel's letter should alleviate our concerns regarding the denial of the right to allocute. In fact, it should do just the opposite. The record does not clearly indicate the letter's purpose, and it even suggests that the choice to read the letter during the sentencing hearing was not Noel's. At the hearing, the district court judge stated:

> All right. And Miss Jensen [Noel's lawyer], do you have a presentation you'd like to make regarding sentencing and would your client like to address me?

To which Noel's lawyer responded:

> I'm sorry, Judge. Mr. Noel provided me with a letter much too late for the Probation Department to include it in the presentence report, *but based on what Miss Helart* [the prosecutor] *has said, I thought it might be appropriate to share with you today.*

(emphasis added). From both the panel's analysis and Chief Judge Easterbrook's concurrence, one would think that Noel wrote this letter specifically for the sentencing hearing. But his lawyer's statements to the court indicate otherwise. Noel's counsel said that *she* chose to read the letter in response to the prosecutor's comments.

Regardless of how it was structured, the letter was not Mr. Noel's allocution, and, in fact, the district judge

said that it "underline[d] the determination [he had] made that [an] acceptance of responsibility [sentencing reduction] was inappropriate." The letter, which Noel's lawyer probably should have kept to herself, denied guilt, shifted blame to others, and offered an apology all at the same time. Noel did not receive an opportunity to retract or even mitigate some of the letter's statements; yet the panel suggests that because his words were read aloud in court, the perceived fairness of the process remains intact. For a right rooted in English common law, which affords a defendant a final opportunity to present information in mitigation of his sentence, *Green*, 365 U.S. at 304, a letter read by defense counsel in reaction to the prosecutor's comments is a poor substitute. It may have caused even more harm, and since Noel did not receive the opportunity to allocute, I do not believe that the letter contributed to preserve the perceived or applied fairness of the sentencing process.

Furthermore, I cannot agree that Noel's eighty-year sentence, which was twenty years below the advisory guideline sentence, somehow renders the proceedings fair. The distinction between an eighty and 100-year sentence is a superficial one. For Noel, both are functionally life sentences (Noel was fifty-three years old at the time). He argued that the eighty-year sentence was still too high and asked for a reduction, which the district court denied based, in part, on his letter. In this particular case, a sentence below the guideline range says little about fairness. Noel could have received a lower sentence if he accepted responsibility or could have had his sentences on each count run concurrently.

*Cf. Adams*, 252 F.3d at 287 (presuming prejudice in cases where, based on the facts at issue and the arguments raised, the district court retained *discretion* to grant a lower sentence).

The right to allocute belongs to the defendant, and the duty is placed squarely on the court to ensure he has the opportunity to exercise it. That everyone overlooked this step does not mean we must do the same. I do not believe any of the factors to which the majority points instill confidence that the core values of our sentencing process are not implicated. *Luepke* contemplated some *rare* instances where the denial of the right does not require a judicial remedy, and I see no reason why this case falls into that narrow category.

## II.

That brings me to the issue raised in Chief Judge Easterbrook's concurrence: the continuing viability of *Luepke*'s presumption of prejudice in reviewing Rule 32(i)(4)(A)(iii) violations. As I stated earlier, the importance of the right to allocute cannot be minimized. It has been recognized, in common law, as early as 1689, that "the court's failure to ask the defendant if he had anything to say before sentencing was imposed required reversal." *Green*, 365 U.S. at 304. And despite the vast improvement in procedural protections afforded to defendants, the right remains an important aspect of our sentencing proceedings, providing defendants with a final opportunity "to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii).

A number of circuits, including ours, have recognized the implausibility of proving prejudice from a Rule 32 violation, *see, e.g., United States v. Haygood*, 549 F.3d 1049, 1055 (6th Cir. 2008); *United States v. Carruth*, 528 F.3d 845, 847 (11th Cir. 2008); *United States v. Reyna*, 358 F.3d 344, 352 (5th Cir. 2004) (en banc); *Adams*, 252 F.3d at 287-88, and without a presumption in favor of the defendant we run the risk of reducing the rule and the right it protects to a meaningless formality. *See United States v. Barnes*, 948 F.2d 325, 331 (7th Cir. 1991) ("[T]he defendant's right to be heard must never be reduced to a formality."). It is our duty to ensure that the right is afforded to *all* defendants, while maintaining a careful balance between judicial efficiency and the redress of injustice. *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009).

Plain error review, outlined in Federal Rule of Criminal Procedure 52(b), maintains the appropriate balance in most cases; however, as the Supreme Court recognized in *Olano*, there are some instances where errors may be presumed prejudicial. *United States v. Olano*, 507 U.S. 725, 735 (1993). In that case, the Court found that a violation of Rule 24(c), which, at the time, required the district judge to discharge alternate jurors after the jury began deliberations, was not the type of error that "affect[s] substantial rights independent of its prejudicial impact," and the Court declined to presume prejudice. *Id*. at 737 (internal quotation marks omitted). In *United States v. Vonn*, the Court held that violations of Rule 11 of the Federal Rules of Criminal Procedure (requiring the district court to ensure that a plea is knowing and voluntary) were still subject to plain error. 535 U.S. 55 (2002).

One can certainly argue that the right to allocute is not more important than the right to a jury free from improper influence, or the right to enter a knowing and voluntary guilty plea. And the Supreme Court's insistence on the plain error standard of review (without a presumption of prejudice) for those violations may suggest that the same should apply here. *See Reyna*, 358 F.3d at 354-55 (Jones, J., concurring). However, I do not believe these cases compel us to abandon our approach in *Luepke*. Our decision to apply a presumption of prejudice is based not just on the importance of the right, but also because the burden would be almost insurmountable for defendants.

Assessing the prejudice caused by the presence of alternate jurors during deliberations was a much more manageable task in *Olano*. The Court considered the fact that the alternate jurors were instructed not to participate in the deliberations and that the mere presence of the jurors did not create a "sufficient risk of a chill" to warrant a presumption of prejudice. *Olano*, 507 U.S. at 740-41. A defendant denied the right to allocute, on the other hand, would have to tell us, after the fact, what he might have said months earlier, and he would also have to convince us that the judge could have responded favorably. Whatever statement he may have made, whether it be a heartfelt plea for mercy or a full-fledged admission and acceptance of responsibility, is of a different character when reduced to an appellate brief. It is highly speculative—who really knows what would have happened at that moment—as is any attempt to assess its impact on a judge who has significant discretion in making sentencing decisions.

Similarly, in *Vonn*, a number of important considerations counseled against a presumption of prejudice or any other exception from plain error review. Although Rule 11 required the district court judge to address the defendant during the plea colloquy, the strong interest in concentrating pleas in trial courts and promoting finality in a system heavily dependent on guilty pleas added another dimension to the balance between judicial efficiency and the redress of injustice. *See Vonn*, 535 U.S. at 72-73. Furthermore, the prejudice to a defendant who alleges a Rule 11 violation is the entry of a plea that wasn't made knowingly or voluntarily. A traditional plain error analysis would place the burden of proving prejudice on the defendant, who is in the best position to know if his plea was voluntary. Putting aside the importance of the rights, I see a significant difference between a rule that places the burden on a defendant who seeks to renege on an agreement he entered into, and one that requires him to tell us how a judge would have reacted to a plea for mercy. The rights invoked in *Olano* and *Vonn* are sufficiently distinguishable from the right to allocute that those cases should not call our holding in *Luepke* into question.

The presumption we adopted is not a direct route to automatic reversal and we have not proposed, at any point, that it be treated as a structural error that justifies reversal without inquiry into prejudice. We have simply applied a *rebuttable* presumption due to the practical difficulties defendants face in enforcing the right during sentencing and on appeal. *Cf. United States v. Syme*, 276 F.3d 131, 154-55 (3d Cir. 2002) (applying a

presumption of prejudice for constructive amendments and analyzing whether the government effectively rebutted the presumption). I am mindful of the Supreme Court's reluctance to expand the list of structural errors and am aware that even constitutional errors are normally subject to a harmless error analysis. But placing the burden on the government to demonstrate the absence of prejudice is not inconsistent with this principle. If the defendant had objected in the district court, the government would bear the burden of proving that the error was harmless. *See* Fed. R. Crim. P. 52(a); *see also Vonn*, 535 U.S. at 62 (interpreting language in Rule 11(h) that tracked Rule 52(a) to provide for "consideration of error raised by a defendant's timely objection, but subject to an opportunity on the Government's part to carry the burden of showing that any error was harmless"); *United States v. Williams*, 559 F.3d 607, 611 (7th Cir. 2009).[1] Shifting burdens

---

[1] Chief Judge Easterbrook maintains in his concurring opinion that the burden of showing prejudice on harmless error review rests on a defendant, and, therefore, *Luepke* makes it easier to reverse on plain error than on harmless error. I disagree. The Supreme Court, in *Kotteakos v. United States*, only placed the burden of proving harmless error on defendants complaining of "technical" errors. 328 U.S. 750, 760-61 (1946); *see also O'Neal v. McAninch*, 513 U.S. 432, 439-40 (1995); *Brecht v. Abrahamson*, 507 U.S. 619, 641 (1993) (Stevens, J., concurring). Otherwise, it is clear that the government bears the burden of proving harmless error in criminal cases. *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009). Although there is no formal definition of the term, the Supreme Court has referred to "technical

(continued...)

of proof alone does not disrupt the Supreme Court's attempts to limit the expansion of structural errors.

We cannot deny the importance of the right to allocute and the steps the district court must take to enforce it. *Green*, 365 U.S. at 304. As a practical matter, defendants are less likely to object on their own when a judge fails to provide them with an opportunity to allocute, and if they do object, the judge will provide that opportunity in most cases. The majority of appeals we encounter—as has been the case thus far—will come from proceedings in which the defendant made no objection. The nature of the inquiry, however, is so speculative that, in almost all cases, the defendant would not be able to prove prejudice, and the right would not be enforced. This is an unacceptable result for a right that implicates the fairness of sentencing proceedings. The state of the law has evolved to give judges significantly more discretion in making sentencing decisions. As a result, we should be more skeptical of imposing

---

[1] (...continued)
errors" as "matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure . . . ." *Bruno v. United States*, 308 U.S. 287, 294 (1939); *see also United States v. Flanagan*, 34 F.3d 949, 955 (10th Cir. 1994) (referring to technical errors as "errors for which there is no reasonable possibility that the verdict could have been affected"). I do not consider a Rule 32 violation minor or inconsequential; therefore, I would also place the burden on the government to prove the absence of prejudice on harmless error review. The way I see it, plain error remains the more difficult standard.

standards that require us to hypothesize what a sentencing judge would have done in a given situation. The presumption we adopted in *Luepke* does not make the denial of allocution a structural error, nor does it advocate for automatic reversal. It recognizes that the right is more than an "unenforced honor code" that judges may follow in their discretion. *United States v. Leon*, 468 U.S. 897, 978 (1984) (Brennan, J., dissenting). The presumption of prejudice allows the right to be enforced and provides a remedy where our procedural rules may have rendered it effectively obsolete. Unless the Supreme Court says otherwise, I see no reason to revisit *Luepke*.